COMMONWEALTH vs. ANDRE O. MALTAIS.

Bristol.  May 4, 1982. — August 4, 1982.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide.  Constitutional Law*, Admissions and confessions, Waiver of
    constitutional rights. *Waiver.  Evidence*, Cross-examination, Admis-
    sions and confessions, Redirect examination. *Jury and Jurors.
    Witness*, Expert. *Practice, Criminal*, Comment by prosecutor, In-
    structions to jury.

At the murder trial of a defendant who, prior to his arrest, had willingly
    involved himself with the police investigation of the murder and had
    had frequent contact with police officials over an extended time, the
    judge correctly concluded that the defendant's inculpatory conduct
    and statements to the police, after being repeatedly advised of his
    rights, were voluntary in the constitutional sense. [82-90]
At a murder trial the judge did not abuse her discretion by refusing to per-
    mit defense counsel to cross-examine the chief prosecution witness con-
    cerning an unrelated murder to which the witness had admitted
    pleading guilty, where it did not appear that the details of that offense
    could tend to prove the witness's bias against the defendant, and where
    the defense had elicited numerous other admissions from the witness
    damaging to her credibility. [90-91]
The record of a criminal trial amply supported the judge's conclusion that
    the jury's ability to render a verdict fairly and impartially was unaf-
    fected by a conversation between two jurors, and overheard by several
    others, concerning the weight to be given certain expert testimony.
    [91-92]
At a criminal trial it lay within the judge's discretion to allow the chief
    prosecution witness to testify on redirect examination that the defend-
    ant had given her drugs when she was eleven years old, where defense
    counsel, on cross-examination of the witness, had elicited admissions
    of drug abuse and had not moved to strike her unresponsive testimony
    that she had been given drugs by the defendant. [92-93]
At a murder trial, the Commonwealth introduced sufficient evidence to
    allow the judge to conclude that a witness was qualified as an expert in
    forensic dentistry. [93]

At a murder trial the prosecution was not required to establish the identity of the victim's body by real evidence, but could choose to rely upon oral testimony.  [93]

A comment by the prosecutor in closing argument at a murder trial, characterizing the defendant's inculpatory conduct as "close to confessing his involvement" in the crime, was adequately dealt with by the judge in her instructions to the jury and thus was not so prejudicial as to require reversal of the defendant's conviction.  [94]

At a criminal trial the judge's instructions to the jury respecting alibi, when considered in their entirety, presented no possibility of prejudice to the defendant.  [94-95]

INDICTMENT found and returned in the Superior Court Department on February 19, 1980.

The case was tried before *Dolan, J.*

*Joseph I. Macy* for the defendant.

*Phillip L. Weiner*, Assistant District Attorney (*Raymond P. Veary, Jr.*, Assistant District Attorney, with him) for the Commonwealth.

LYNCH, J.  Andre O. Maltais was convicted of murder in the first degree of Barbara Ann Raposa.  He appeals his conviction, alleging errors of law and seeking relief, in addition, pursuant to G. L. c. 278, § 33E.  Since we find no error and see no reason to grant relief under § 33E, we affirm the judgment of conviction.

Evidence introduced at trial tended to show the following facts.  On the evening of Wednesday, November 7, 1979, one David Cowen picked up Raposa and her infant son Eric at her apartment in Fall River.  They left Eric at a babysitter's apartment so they could attend a movie.  They stopped briefly at a restaurant in Fall River.  Raposa, in need of money, decided instead to spend the evening "working the street" as a prostitute.  She had Cowen drop her off on a street in Fall River and arranged to meet him later at a nearby saloon.  Cowen waited in the saloon until 1 A.M. the next morning, venturing out to look for her at intervals; she did not appear.  Her father reported her disappearance to the Fall River police department the next evening, Thursday, November 8, 1979.  On January 26, 1980, Raposa's body,

with hands bound and skull crushed, was discovered in the woods near R. E. Smith Company's (RESCO) plant in Fall River.

Robin Murphy, the chief prosecution witness, met Andre Maltais in a bar in Fall River at approximately 12 midnight on the date of Raposa's disappearance. Murphy and the defendant proceeded to a local diner to pick up Raposa. As they drove there, Maltais told Murphy that he intended to kill Raposa for dating David Cowen.[1] When the three of them left the diner, Raposa was in the front seat of the defendant's car with the defendant, and Murphy was in the back seat.

Maltais gave his passengers a marihuana cigarette, and all three smoked it. Murphy and Raposa started fighting. The fight continued until the defendant stopped the car in the woods near RESCO and pulled Raposa away from Murphy. Maltais and Raposa talked outside of the car, while Murphy remained inside.

Maltais returned to the car, got the keys, and opened the trunk. He removed two paper bags and went into the woods with Raposa. Murphy observed the defendant and Raposa having sexual relations. Murphy remained in the car listening to the radio. She heard Raposa scream. She turned toward the wooded area and saw Maltais sitting on Raposa, holding a rock above his head with both hands. Murphy turned away and continued listening to the radio. The defendant subsequently returned to the car and placed the two paper bags in the trunk. He told Murphy that he wanted the victim to "crawl away." He drove Murphy to her mother's home. Murphy testified the defendant threatened that someone would "get her [Robin]" if she ever "said anything against" him.

During the course of the investigation into Raposa's disappearance, the defendant frequently talked to police officials, ostensibly to offer information and assistance. On

---

[1] Maltais was well acquainted with Raposa and believed himself to be the father of her son Eric.

February 7, 1980 (nearly two weeks after Raposa's body was discovered), he was arrested and charged with her murder. At trial, the defendant took the stand to testify that he had been at home with his mother on the evening of November 7. His mother, who also testified, corroborated her son's alibi. On January 30, 1981, a jury found Maltais guilty of murder in the first degree. He was sentenced to life imprisonment.

Other evidence will be discussed as it bears on the defendant's claims of error.

1. Before the trial, Maltais moved to suppress statements he had made to police on various occasions after Raposa's disappearance. A motion judge of the Superior Court conducted a hearing and subsequently denied the defendant's motion, making written findings of fact. The trial judge, who conducted a voir dire of each of the police officers called to testify regarding the defendant's statements, adopted the motion judge's findings and also concluded that the defendant's statements were made voluntarily. On appeal, the defendant claims that the motion judge's denial of his motion to suppress was error. There is no basis for such a claim. In order to make this clear, however, we must discuss at some length the defendant's voluntary involvement in investigations conducted by the Fall River and the Massachusetts State police.

On November 12, 1979, Maltais went to the Fall River police station and asked a police officer working in the youth aid and supervision bureau whether she had any information on Raposa. He inquired again of this officer on November 26, and during the first week of December, 1979. The officer was unable to provide him with any information concerning Raposa's disappearance; Maltais, however, reported to the officer various rumors relating to Raposa's whereabouts which he claimed to have picked up on the street.

In late November or early December, 1979, Maltais appeared at the home of State police trooper Lloyd Wheaton, a former classmate, and told Wheaton that he knew two

women who might have information about the murder of one Doreen Levesque. Shortly thereafter, the defendant drove to the State police barracks at Dartmouth and asked to speak to someone investigating that murder. Maltais was introduced to Corporal Paul Fitzgerald. They arranged for another meeting to take place. Maltais brought Robin Murphy and Karen Marsden with him to the second meeting. Maltais parked his car at the local coffee shop; Fitzgerald met the trio and drove them to the barracks, where they talked. During the weeks following this meeting, Maltais telephoned Fitzgerald frequently, ostensibly to report on Maltais's attempts to garner information about the Levesque murder.

On Sunday, January 27, 1980, the day after the discovery of Raposa's body, Detective Sergeant Paul Carey and Detective Joseph Phelan of the Fall River police department visited Maltais's apartment at 5:05 A.M. The defendant's mother answered the door, and Maltais soon appeared from the bedroom. The officers identified themselves, notified the defendant that a body had been discovered, and requested that the defendant come to the police station. Maltais asked, "Is it regarding Barbara?" After receiving an affirmative answer, he agreed to meet the officers at the Fall River police station. Maltais dressed, then drove his own car to the station. He was not under arrest.

Maltais arrived at the police station at 5:15 A.M. Detective Carey, reading from a Miranda "rights card," advised the defendant of his right to remain silent, to terminate the questioning at any time, to have an attorney present at public expense if he could not afford one, and that anything he said could be used against him in a court of law. Maltais responded that he understood his rights and did not wish to have an attorney present; he signed a written waiver of his rights. The defendant told Carey that he had telephoned the State police "higher-ups" before leaving home, and said they would arrive later to take over the investigation. The police officers thereafter proceeded to discuss Raposa's disappearance with the defendant.

At approximately 6:30 A.M., Detective Roger St. Pierre of the Fall River police department arrived at the station house. St. Pierre introduced himself to the defendant and again read the defendant his constitutional rights from a departmental form. Maltais repeated that he understood his rights and did not wish to retain counsel. St. Pierre continued to discuss Raposa's disappearance with the defendant. Police officers questioned Maltais until 9:30 A.M., at which time the defendant left the police station, unaccompanied, to attend church services.

Maltais returned to the station at noontime. St. Pierre advised the defendant of his rights for the third time that day; Maltais indicated that he understood those rights. During this interview, at which Corporal Fitzgerald was present, the defendant told officers that he had last seen Raposa on the afternoon of November 6, 1979. After meeting her on a downtown street, he accompanied her to her apartment. She retired to the bedroom while Maltais fed and changed the infant, washed the dishes, and left approximately one hour later.

During the course of the questioning, which continued until 4:30 P.M., the defendant drank coffee with the officers and ate lunch with them. He signed two consent forms to allow officers to search his automobile and his home. Officers who searched the defendant's automobile found two paper bags. At trial, Robin Murphy identified the bags and their contents as those she saw Maltais take from the automobile while it was parked near the RESCO plant on November 7, 1979.[2]

Two days later, on January 29, 1980, Fitzgerald telephoned the defendant and asked him if he would agree to meet the district attorney. The defendant assented, drove to the State police barracks in Dartmouth, and met Fitzgerald later in the day. Fitzgerald drove Maltais to the of-

_____

[2] Maltais testified that he had found the bags and their contents in a closet at Raposa's apartment when he was cleaning that apartment after her disappearance.

fice of the district attorney for Bristol County, where the defendant again was interviewed by Fitzgerald and St. Pierre; also present were District Attorney Ronald A. Pina and a stenographer. St. Pierre recited the Miranda warnings before questioning the defendant. Maltais responded that he understood his rights and did not wish to have an attorney present. He signed a form acknowledging the waiver of his rights.

During this interview, the defendant repeated what he had told police officers on January 27. He also told St. Pierre and the other officers that, in an effort to come up with more information about Raposa's disappearance, "I go to bed at night and sat down all the time and tried to put myself in the picture with her and be in her place." At the end of the interview, Maltais said, "If I could go there [to the site of the murder] sometime with one of you guys, sometime just to look around to get an idea," maybe it would help out. Corporal Fitzgerald told the defendant, "We're going to go over there in the next couple of days. I'll give you a call the next time we go there." The interview concluded, and Fitzgerald drove the defendant back to his car.

On February 2, 1980, Corporal Fitzgerald telephoned Maltais and asked him if he would be willing to undergo a "stress test." The defendant agreed, and on February 4, he drove to the Bristol County district attorney's office. Fitzgerald advised the defendant of his rights, and the defendant signed a waiver-of-rights form. The defendant took the test,[3] which lasted about two and one-half hours; thereafter he departed in his own car.

At 9 A.M., February 5, 1980, Maltais telephoned Fitzgerald at the State police barracks and told the officer that he had had a dream just before waking up which he wanted to discuss. The defendant said that he wanted to come over,

---

[3] The results of this test were not introduced in evidence. The test was recorded stenographically, however, and certain of the defendant's statements were used to impeach him at trial.

but he had no gas in his car. Fitzgerald arranged to have two Fall River police officers pick up the defendant at his home and bring him to the district attorney's office. At the office, Fitzgerald advised Maltais of his constitutional rights. The defendant interrupted him, saying, "You've told me this a hundred times. You don't have to tell me again." Fitzgerald, nonetheless, gave Maltais the Miranda warnings once again.

The defendant began discussing a dream in which two angels showed him the murder of Raposa. He said that, as he floated in the air at treetop level, he saw a man carry a woman and drop her on the ground. Maltais recognized her as Raposa. The man walked away and got an object. He returned, stood behind Raposa's head, lifted the object (a rock) over his head and struck the victim repeatedly in the face, all the while screaming at her and cursing in bad English. The victim was screaming, "Andy help me . . . Andy forgive me." The murderer told her, "Andy is not going to help you, anymore." Maltais said the motive for the murder was a love affair: the killer liked Raposa and she doublecrossed him. The defendant stated that the victim was overdosed on drugs; otherwise she would not have accompanied her killer to the area.

At the request of the district attorney, Maltais examined a newspaper photograph of the area where the body was found, and he marked on the photograph the space where he was floating in the air, as well as the place where the murder occurred. He explained that he had never been there before. Toward the end of the interview, a colloquy occurred between the defendant and District Attorney Pina.[4] The defendant's counsel asserts that the assurances

[4] This portion of the interview, which was transcribed, is as follows:
THE DISTRICT ATTORNEY: "Anything else you can think of?"
THE DEFENDANT: "No. Not at this moment. Gives me a headache to get in that far."
THE DISTRICT ATTORNEY: "I can imagine. But you never saw him?"
THE DEFENDANT: "I wanted to go to that scene because I could help."
THE DISTRICT ATTORNEY: "You never been at the scene at all?"

allegedly made to the defendant by the district attorney in the course of this exchange must be held to have made Maltais's subsequent statements and actions involuntary in the constitutional sense, and constitute reversible error.

Following the colloquy quoted in the margin, Maltais, accompanied by police officers, proceeded to the RESCO site. The district attorney and two stenographers travelled there in another automobile. As the defendant left the building in which the interview had taken place, the officers escorting him heard Maltais say, "I think they've got me now." When they arrived at the RESCO site and the defendant was getting out of the car, the officers heard Maltais say, "I know they've got me now."

As Maltais walked among the trees, he told the officers that he was "getting vibes and visions." After some wandering, he stopped by a tree and said, "That's where the body was." He indicated that Raposa's feet were at the base of the tree and her head was in the opposite direction.

---

THE DEFENDANT: "Never been, and never been. I wanted to go, you know, for obvious reasons so there won't be no misbelief over something made up or something 'cause I seen him. By the way, I could see something that they overlooked, you know, I'm not saying that cop is a dummy. Maybe I might see what I see in my head, you know; but I'm afraid to go because I'm afraid to cry. I haven't been able to cry since this happened."

THE DISTRICT ATTORNEY: "I don't want you to go if it bothers you."

THE DEFENDANT: "I want to go and get that person over with."

THE DISTRICT ATTORNEY: "Do you think it would help your dream if we go?"

THE DEFENDANT: "Instead of sitting here, we can stop this other foolishness and take a look at the — in fact, I might be able to come up with some pointer and go in there where she was found, how was found, who found her, you know; and people are walking. Now. Maybe I could see a car."

THE DISTRICT ATTORNEY: "Okay. Officer McMahon is here. Officer Fitzgerald is still here. Lieutenant Kaegael, Fall River Police. Lieutenant Correia, Fall River Police. All here to help. Now, this is all you can remember?"

THE DEFENDANT: "I don't know why that this is all I'm — I'm allowed probably to remember so much; and its a puzzle that will be in time. I am going to try, nothing to lose."

THE DISTRICT ATTORNEY: "Nothing to lose at all. Maybe it will help us."

He then pointed to a slight indentation in the ground, one of many in the area, and remarked that her head was "right here." An officer who had been at the site on January 26, 1979, the day the body was discovered, testified that Maltais pointed to the exact spot where Raposa's head had lain.

Maltais stated that the killer may have planned to have sexual relations with his intended victim and that Raposa, in fact, knew her murderer very well, and was surprised by the confrontation at the murder site. The defendant identified the place where the killer stood, and he demonstrated the killer's stance in relation to the body. Maltais believed the murder weapon to be a round rock about a foot in circumference. He claimed that, in his vision, he observed the killer strike Raposa directly in the center of her face, and then direct his blows to other parts of her head. Maltais had one of the police officers position his cruiser in the spot where, according to the defendant, the killer's car had been parked. He had the officer open the cruiser's trunk. He thought that the killer might have taken Raposa from the trunk of his car before carrying her into the woods; he stated that the killer had tied Raposa's hands. Finally, the defendant approached a mound of broken chunks of concrete and said, "I sense a murder weapon in that pile."

After spending approximately three hours at the RESCO site, police officers returned Maltais to his home. Two days later, on February 7, 1980, he was arrested for Raposa's murder.

At the time of Raposa's death, Maltais was forty-two years old. He claimed to have suffered a stroke in May, 1979, which caused him difficulty in walking, and required him to use a cane. He admitted, however, that in November, 1979, he was able to drive a car and perform light carpentry work. Maltais's formal education ended after the seventh grade, but he told the jury that he read two newspapers every day, as well as books and magazines. In his courtroom testimony, Maltais responded coherently to the questions of counsel and was reasonably articulate.

On appeal, the defendant's counsel asserts that the statements given to police by the defendant were not made voluntarily. Counsel directs our attention primarily to one comment made by the district attorney to the defendant during the last interview before his arrest, when the district attorney said, "Nothing to lose at all. Maybe it will help us." The defense argues that the decision to go to the murder site was made, not by the defendant, but by the district attorney. We have discussed at length the defendant's frequent contacts with police officials in order to demonstrate the weakness of this argument. On the record, the decisions to "cooperate" with the police, and to go with police officials to the RESCO site, clearly were made by the defendant.

As the motion judge found, Maltais was given Miranda warnings before every interview from which his statements were related to the jury. The Commonwealth, of course, bears the burden of demonstrating that the defendant has made a knowing, intelligent, and voluntary waiver of his constitutional right to remain silent and to be represented by counsel. *Commonwealth* v. *Davis*, 380 Mass. 1, 3 (1980). The motion judge ruled, however, that Maltais's oral statements of waiver, coupled with his apparent willingness to speak and cooperate with police, constitute adequate expressions of waiver.

The motion judge also found a complete absence of evidence that the police threatened, tricked, or cajoled the defendant into waiving his constitutional rights. See *Commonwealth* v. *Dustin*, 373 Mass. 612, 614 (1977), cert. denied, 435 U.S. 943 (1978). His findings of voluntary waiver are entitled to substantial deference. *Commonwealth* v. *Tavares*, 385 Mass. 140, 145 (1982). In any event, our review of the record convinces us that the motion judge's conclusions were correct. The argument of defense counsel, stripped to its essentials, is simply that the defendant's statements were not voluntary in the constitutional sense because certain of those statements were inculpatory and no intelligent individual, absent coercion or trickery, would make

Commonwealth v. Maltais.

inculpatory statements to police officials. As the facts of this case disclose, that proposition is untenable.[5]

2. During the direct examination of Robin Murphy, the chief prosecution witness, she admitted to having pleaded guilty to the charge of murder in the second degree in a case unrelated to that of the defendant. On cross-examination, defense counsel attempted to elicit from her the details of this crime; the trial judge sustained the prosecutor's objections to this line of questioning. Counsel argues for the first time on appeal that the defendant "should have been given the opportunity to demonstrate that the [unrelated] murder was so heinous and unforgettable that Murphy's testimony was based solely or primarily on bias," and that the trial judge's limitation on the scope of cross-examination constituted reversible error.

"[T]he scope of cross-examination, including to what extent the accuracy, veracity, and credibility of a witness may be tested, rests largely in the sound discretion of the [trial] judge, not subject to revision unless prejudice is shown to a party by reason of too narrow restriction or too great breadth of inquiry." *Commonwealth* v. *Smith*, 329 Mass. 477, 479 (1952). Accord, *Commonwealth* v. *Turner*, 371 Mass. 803, 811 (1977); *Commonwealth* v. *Hall*, 369 Mass. 715, 731 (1976). Defense counsel has not suggested how the details of the unrelated murder to which Murphy pleaded guilty could possibly tend to prove her bias against the defendant. With respect to Murphy's credibility, defense counsel's cross-examination brought forth admissions from Murphy that she was a prostitute, a lesbian, and an alcoholic at the time of Raposa's murder, that Murphy used drugs, that she had taken money from other prostitutes (although she denied being a pimp), and that Murphy had lied to police during the investigations into the murders of Raposa and

---

[5] We note that, on the basis of the evidence before them, both the motion judge and the jury reasonably could have found the defendant's "cooperation" to be based on his desire to throw police investigators off his track and to apprise himself of the progress of their investigations.

others.  Defense counsel also established that Murphy had told police she was totally drunk on the night of Raposa's murder.  The trial judge did not abuse her discretion in so limiting defense counsel's cross-examination.

3.  Defense counsel moved for a mistrial when, after an expert witness had testified, the jury foreman revealed that another juror had asked his opinion regarding the weight to be given the expert's answer to a hypothetical question.  The foreman may have given his opinion to the inquiring juror.  The defendant's motion was denied, and counsel now claims that denial was error.  The foreman, the inquiring juror, and three other jurors who may have overheard or observed something of the exchange all stated that their ability to judge the case impartially was not affected.  The judge repeated his earlier admonition to the jurors collectively not to discuss the case until the close of the evidence.

The Commonwealth asserts that the defendant's claim of error is groundless, arguing that only when "extraneous" information (received from sources outside the courtroom) might have influenced the jury may such a claim be raised.  See *Commonwealth* v. *Fidler*, 377 Mass. 192, 193 (1979); Proposed Mass. R. Evid. 606 (b) (1980); Fed. R. Evid. 606 (b).  The distinction drawn by the court in *Fidler*, however, was between "overt factors and matters resting in a juror's consciousness."  *Id.* at 198.  Where the matters in question rest in a juror's consciousness, the value of that juror's testimony with respect to those matters is outweighed by the need to protect the juror's privacy.  *Id.*  Accord, *Commonwealth* v. *Tavares*, 385 Mass. 140, 155 (1982).

This case does not require our decision whether those "overt factors" regarding which a juror properly may testify are limited to information received by jurors from sources outside the courtroom.  The trial judge in the instant case conducted a thorough inquiry into the jurors' conversations that formed the basis for the defendant's motion for a mistrial, and concluded that the jurors involved could fairly and impartially render the verdict.  We have reviewed the record.  The trial judge's conclusion, far from being "clearly

erroneous" (see *id.* at 156), is amply supported by that record. We decline to disturb it.

4. The defendant argues that the judge erred in allowing Murphy to testify during redirect examination, over objection, that the first time she took drugs, they were given to her by the defendant when she was eleven years old and he had picked her up hitchhiking. She also testified that the defendant had given her drugs in succeeding years. During cross-examination, however, defense counsel had questioned Murphy at length about her use of drugs and alcohol. In a nonresponsive answer to counsel's question, Murphy had testified during cross-examination that Maltais had given her drugs; counsel did not move to strike. Murphy also answered affirmatively when defense counsel asked her if she had been using drugs and alcohol "[w]ay prior to 1979." On appeal, defense counsel asserts that he did not intend to extend his cross-examination beyond Murphy's drug use in 1978 and 1979. He also claims that introduction of this evidence "was grossly improper in that it introduced alleged prior bad acts for which the defendant had never been convicted."

The scope of redirect examination of a witness is within the sound discretion of the trial judge. See *Kendall* v. *Weaver,* 1 Allen 277, 279 (1861). A defendant who claims, on appeal, an abuse of discretion, assumes a heavy burden. See *Commonwealth* v. *Bys,* 370 Mass. 350, 361 (1976). The judge did not abuse her discretion in admitting the challenged testimony. Defense counsel explored the subject of Murphy's drug abuse on cross-examination; the judge's decision to allow the witness to explain her involvement was permissible for rehabilitation purposes. See *Commonwealth* v. *Dougan,* 377 Mass. 303, 309 (1979), and cases cited. Murphy's testimony on redirect tended both to prove that she knew the defendant well enough to identify him as Raposa's murderer despite Murphy's admitted drunkenness on the night of the murder, and also to offer the jury at least a partial explanation of Murphy's failure to tell police officers about the defendant's role in Raposa's murder until many

months after it occurred. That Murphy's testimony also tended to prove Maltais guilty of a crime for which he had not yet been convicted is not significant; the testimony was offered for other purposes. *Id.* at 308.

5. According to the defendant, the Commonwealth did not prove beyond a reasonable doubt that the body discovered at the RESCO site was that of Barbara Ann Raposa. His principal contention is that the Commonwealth should have introduced in evidence certain X-ray photographs and dental records on which the Commonwealth's witnesses based their identification. He also argues that one witness recognized as an expert in forensic dentistry by the trial judge was not qualified. Both contentions are without merit.

The admission of expert testimony lies largely in the discretion of the trial judge. *Commonwealth* v. *Devlin,* 365 Mass. 149, 152 (1974), and cases cited. The Commonwealth introduced sufficient evidence to allow the trial judge to conclude that the witness in question was qualified.[6] The witness clearly possessed "sufficient skill, knowledge or experience in the field of his testimony that the jury [could] receive appreciable assistance from it." *Commonwealth* v. *Boyd,* 367 Mass. 169, 182 (1975). Defense counsel also challenges as insufficient the chain of custody of certain specimens taken from the body discovered at the RESCO site. His challenge is without a basis in the record. The Commonwealth clearly demonstrated the chain of custody. To the extent that counsel contends that the Commonwealth was required to introduce real identification evidence rather than testimony based thereon, he is wrong. The decision regarding what identification evidence to offer is in the hands of the prosecutor. The weight of that evidence, of course, is for the jury to determine.

---

[6] Although the witness had never before testified at a trial, he was licensed to practice dentistry in four States, was certified in orthodontics, had been trained in forensic dentistry at the University of Connecticut, was one of four Connecticut State police surgeons, and was employed to identify by means of dental examinations the bodies of individuals (usually burn or accident victims) which could not be identified by the usual means.

6. Defense counsel claims that the prosecutor committed reversible error in his closing argument. In referring to testimony that the defendant had circled, on a newspaper photograph of the murder site, the exact location of the body (while asserting that he had never seen the site), the prosecutor made the following statement: "I would suggest to you that when the defendant put the circle on that photograph, he was getting very, very close to confessing to his involvement." The judge interrupted the prosecutor, and ordered him to "[e]liminate the word, confessing, Mr. [Prosecutor]. It has nothing to do with this murder, and the jury will disregard any implication at all to be [derived] from this." In light of this instruction, and of the judge's advice to the jury that the remarks of counsel were not evidence, the prosecutor's comment, even if it constituted error, clearly was not so prejudicial as to require reversal.[7]

7. The defendant argues that the judge misstated the law with respect to alibi in her instructions to the jury. He quotes one sentence, out of context, in support of his argument. The judge did state that "the ultimate objective of evidence that the defendant was elsewhere [than on the scene at the time of the murder] is to rebut the evidence of the Commonwealth to such an extent at the very least that there is created in the minds of the jury a reasonable doubt of the defendant's guilt." A few sentences later, however, she emphasized that "it must constantly be borne in mind that from the beginning of the trial until the jury returns its verdict, the burden of proof is upon the Commonwealth to satisfy the jury beyond a reasonable doubt of the defendant's guilt, notwithstanding the presentation of the evidence by

___

[7] We note also that, before allowing police officers to testify regarding the defendant's statements about his "dream," the trial judge instructed the jury that they were to disregard those statements if they determined the statements were not made voluntarily. This instruction, which she repeated during her charge to the jury at the close of the trial, was given pursuant to the Massachusetts "humane practice." See *Commonwealth v. Cole*, 380 Mass. 30, 39-40 (1980). The judge also charged the jury that "you cannot read into this [account of the 'dream'] any psychological aspect of confession or read between the lines."

the defense that he was at home and not at the scene." She rephrased this statement of the law three times in the next few sentences. When the defendant, at the close of the instructions, objected to her use of the word "rebut," she gave a clear and comprehensive curative instruction.[8] Taken as a whole, the judge's instructions on alibi contained every one of the elements of the model charge set forth in *Commonwealth* v. *McLeod,* 367 Mass. 500, 502 n.1 (1975). We find not the slightest possibility of prejudice to the defendant in these circumstances.

8. Finally, the defendant requests that we grant him relief pursuant to G. L. c. 278, § 33E. On the record, no new trial or reduction in the verdict to a lesser degree of guilt is warranted. In addition to the evidence of the defendant's guilt which we have discussed in the course of this opinion, the Commonwealth introduced evidence tending to show that Maltais and Raposa had quarreled bitterly over her relationship with David Cowen. Further, within a week of the murder, Maltais attempted to sell back to the dealer some used appliances which he and Raposa had purchased, telling the dealer that Raposa had run away. Shortly thereafter, Maltais again attempted to sell the appliances, informing the dealer that "nobody'd ever see [Raposa] again."

The jury's verdict clearly was not against the law or the weight of the evidence. We have examined the record carefully. It discloses no reason for requiring a new trial or the entry of a verdict of a lesser degree of guilt.

*Judgment affirmed.*

---

[8] After repeating the challenged sentence, the judge told the jury, "The problem becomes . . . the word, rebut. It lets you think that the defendant is obliged to rebut anything that the Commonwealth has offered by way of evidence. The defendant is not required to rebut anything. That really is the whole sentence's context. It talks about what the objective is, now at its minimum level, so just strike that sentence out and understand that the defendant isn't required to rebut anything. . . . In case [the sentence] caused you any confusion, disregard it."