STATE v. BOBBY JOE WHITE.

(Filed 20 September, 1967.)

1. **Homicide § 20—**

Evidence tending to show that the deceased and several persons were scuffling in a poolroom, and that the defendant, attempting to aid a friend, shoved the deceased and stated that "there was nobody going to run over" his friend, and that the defendant then shot the unarmed deceased with a pistol, *is held* sufficient to be submitted to the jury on defendant's guilt of murder in the second degree.

2. **Homicide § 16—**

Testimony that on the day before the homicide the defendant stated that he dreamed he had shot the deceased, while too uncertain and conjectural to show ill will and malice towards deceased, does not justify a new trial, it appearing that the evidence had no probative force upon the jury.

3. **Criminal Law § 170—**

A remark of the court, in excluding defendant's testimony which explained a prior offense, that "we can be here 60 days trying all this stuff," *held* cured by a prompt instruction to the jury not to consider the remark.

APPEAL by defendant from *Bundy, J.*, and a jury, 12 June 1967 Session of MARTIN.

Criminal prosecution on an indictment correctly charging defendant with murder in the first degree of James Henry Brown, alias "Bud". G.S. 15-144.

At the beginning of the trial, the solicitor for the State, in open court, announced that he would not ask for a verdict of guilty of

murder in the first degree, but a verdict of guilty of murder in the second degree or guilty of manslaughter as the facts may appear. Defendant entered a plea of not guilty through his counsel. Verdict: Guilty of murder in the second degree. Whereupon, upon request of defendant's counsel, the jury was polled and each juror was asked if his verdict was that the defendant was guilty of murder in the second degree and if he still assented thereto, to which each juror replied in the affirmative. From a judgment of imprisonment, defendant appeals to the Supreme Court.

*Attorney General T. W. Bruton, and Deputy Attorney General, Ralph Moody, for the State.*
*Edgar J. Gurganus, and Weeks & Muse by T. Chandler Muse for defendant appellant.*

PARKER, C.J. This is a brief summary of the State's evidence and the defendant's evidence favorable to the State: Defendant weighs about 230 pounds, and is about 27 years old. The deceased, James Henry Brown, alias "Bud" Brown, who hereafter will be called "Bud", was about 25 years old and weighed about 155 or 160 pounds. Defendant and Bud have been good friends and had never had any trouble. About 7:30 p.m. on 27 January 1967, Booker T. Brown, Wig Clark, a man by the name of Skeet, and Bud were in a poolroom located on Sycamore Street in the Town of Williamston shooting pool. While they were shooting pool, Wig Clark and Bud got into an argument over money; Bud said he owed Clark fifty cents and Clark said he owed him one dollar. After they had argued for two or three minutes, Bud got around behind Clark and was choking him. Booker T. Brown broke Bud's arm from around Clark. Bud and Clark started back together and the defendant shoved Bud. When defendant shoved Bud he was going toward Clark. Bud started back to defendant, and Booker T. Brown got in between them, having a hand on their chests. Defendant said, "(T)here was not nobody going to run over Clark." After he said that, somebody said, "(W)on't nobody going to run over Bud." Booker T. Brown said to the defendant, "You all quit this mess, no need of it."; and he talked to Bud the same way. At this time a shot went off. That is when defendant shot Bud in the chest with a pistol. Booker T. Brown had his hand in Bud's chest, and the pistol bullet wounded him in the hand. After Bud was shot he took about three or four steps and kneeled down on his knees and rolled over on his back, and died on the floor of the poolroom. When Bud was shot he had his left hand in his hip pocket. Bud is right handed. Defendant admitted Bud died as a result of the pistol wound in his chest. When Bud's dead

body was taken to the hospital, it was searched and all that was found in his pockets was a wallet and a little change.

The defendant's testimony in brief summary shows the following facts: On 27 January 1967, he worked at Aurora. He returned from his work, ate supper at home, and left about a quarter to eight. He had a pistol with him that he was carrying to a gunsmith to have the handle fixed. He kept it in his home for protection. He went into the Town of Williamston; the gunsmith lives on Highway 125 north of Williamston. When he came into Williamston he went to Booker T. Brown's house for his pay for hauling Booker T. Brown and Wig Clark to work. Booker T. Brown was not at home. In leaving for the gunsmith's, he turned down Sycamore Street and saw Booker T. Brown's truck parked in front of the poolroom. He stopped there to pick up the money that he owed him for riding. When he drove up, the pistol was on the dash of the truck; he put it in his pocket for fear some little boy would come along and take it. He went into the Hitching Post poolroom. When he went into the poolroom, Booker T. Brown and Clark paid him the money that they owed him. He joined them and shot a couple of games of pool, shooting pool for about an hour. While they were shooting pool, Bud and Skeet came in. He knew them both well; he had known Bud for fifteen years or longer; they had been good friends all this time; he had never had any trouble with him; he married Bud's first cousin. Bud and Wig Clark were arguing about money. Wig Clark started back to shooting pool. Bud jumped on him from behind his back, grabbed him, and was choking him. Booker T. Brown was standing three or four feet from them. He said, "You all stop that." Booker T. Brown was pulling them apart. Defendant said, "You all stop, you were raised up together, good friends, always known each other, no need of this mess." They stopped. The man said he had to close up the place. Defendant said, "Going to have trouble around here tonight." Bud started back at Wig Clark. Defendant said, "Come on, man, no need of this. * * * We all work together, raised together, ain't no need fighting each other, let's go home." When he said that, Bud turned from Clark and started toward him, blowing and puffing, and saying, "You're bad, bad." He pushed Bud back, and when he pushed him back he ran his left hand in his pocket, and that is when he shot him. He did not know what he was going after in his pocket, so he shot him. Booker T. Brown was holding Bud. He did not aim at Bud when he shot him. He knew that Bud had a reputation for being a dangerous and a violent man. He knew that Bud had broken the jaw and knocked three teeth out of the jaw of "Little Bud" Freeman about ten months previous. He learned Bud beat Robert Andrews down to the ground at the Williamston

depot; Bud could not go in Bobby Ormon's place because he had been fighting in there. He had taken Bud home several times to keep him from getting into trouble. Bud raped a girl in New York City and served time for it. Defendant admitted that he himself had been convicted in Federal Court in Washington, North Carolina, for non-taxpaid liquor in 1958 or 1959; that he had been convicted of assault on a female; that was for slapping his wife.

The evidence was amply sufficient to carry the case to the jury on the charge of murder in the second degree.

Booker T. Brown had known Bobby Joe White for twelve or thirteen years. They worked together in Aurora. He worked with the defendant the day before Bud Brown died. He was asked this question: "The day before Bud Brown died, what conversation did you have with Bobby Joe White?" The defendant objected and was overruled. He answered: "We were riding to work together every day. That Thursday morning we were going to work, he said he dreamed that he had shot Bud." Defendant assigns as error the admission of this testimony. Defendant denied making any such statement. Defendant contends in his brief the jurors were not competent to interpret the meaning of a dream, and states in his brief: "We submit that even a highly specialized expert would have difficulty explaining the meaning of such a dream. Where the matter is so speculative, appellant contends that it could have no probative value and could only have prejudiced him in the minds of the jury."

The State contends in its brief that the statement of defendant that he dreamed that he shot Bud was competent to show ill will and malice against the deceased.

Defendant states in his brief that he can find no authority in respect to dreams. Nor can we. Webster's International Dictionary, Second Edition, defines "dreams" as follows: "1. a series of thoughts, images, or emotions occurring during sleep; any seeming of reality or events occurring to one sleeping." Webster's Third New International Dictionary defines "dream" as follows: "1.a: a series of thoughts, images, or emotions occurring during sleep: a semblance of reality or events occurring to one asleep. b: psychoanalysis: condensed, elaborated, symbolized, or otherwise distorted images of memories or of unconscious impulses experienced esp. during sleep but also during other lapses in attention the meaning of which is concealed from the ego." We can find no definition of "dream" in Black's Law Dictionary, Fourth Edition; in Ballentine's Law Dictionary, Second Edition; in C.J.S., or in Am. Jur. 2d; or Words and Phrases. We agree with the statement in defendant's brief: "We submit that even a highly specialized expert would have difficulty explaining the meaning of such a dream." What a dream means, if

anything, presents an occurrence filled with mystery. As to the meaning of a dream, we can only conjecture. The evidence as to the statement of the defendant that he dreamed that he shot Bud leaves the meaning of the dream in the realm of mere conjecture, surmise, and speculation, and one surmise may be as good as another. Nobody knows. It is clear that a statement of a witness is competent when it declares an intention, a purpose, a design, a motive, an assent, a knowledge or belief. McCormick On Evidence, p. 567. A resort to a choice of possibilities is guesswork, not decision. *Hanrahan v. Walgreen Co.*, 243 N.C. 268, 90 S.E. 2d 392. Bacon, in his Essay of Prophecies, says in respect to prophecies and dreams, other than divine prophecies: "My judgment is, that they ought all to be despised; and ought to serve but for winter talk by the fireside." Even if the evidence were incompetent as contended by defendant, it is, in our opinion, so speculative and uncertain as to have had no probative force on the minds of a jury and would not justify a new trial of this case.

During the redirect examination of defendant by one of his counsel, the following question was asked: "You say you were charged with assault on a female, who was that on?" The court replied: "He said it was his wife." Counsel for defendant said: "Would you tell me what the circumstances were surrounding it?" The court replied: "Oh, I am not going to try out that case." Defendant's counsel asked him what disposition was made of that case. He answered that he paid the costs of court. He said he was convicted in a worthless check case. The disposition of that was that he paid the check off. He stated, "Yes, I gave a worthless check in that case." His counsel asked him: "Did you ask the man you gave the check to, to hold the check for you?" The court sustained an objection by the State and remarked: "We are not going to try it over. Gentlemen, we can be here 60 days trying all this stuff." Upon objection to the comment of the court, the court said to the jury: "Gentlemen, any comment the court made, if you heard it, do not pay any attention to it. I still say I am not going to try out these other cases." Defendant assigns as error the court's comment that "we can be here 60 days trying all this stuff." If the judge committed any error in his remarks, he promptly cured it by instructing the jury: "(D)o not pay any attention to it." Further, if all these collateral matters could be gone into in minute detail, the trial of cases would be unreasonably and unduly prolonged, and would lead to confusion in the minds of the jury. This assignment of error is overruled.

The defendant has several assignments of error to the charge. Reading the charge in its entirety, it shows that the judge delivered an accurate and correct charge on every aspect of law in the case

and applied the law to the facts. In addition, he explained fully the law of self-defense, which was the defendant's defense, and gave verbatim practically a full page of defendant's special prayers for instructions as applicable to the law of self-defense. The charge was entirely fair to the defendant. The law in respect to homicide in self-defense is well settled in this State. A careful examination of the assignments of error in respect to the charge discloses no new question or feature requiring extended discussion. The jury, under application of settled principles of law, resolved the issues of fact against the defendant. All the defendant's assignments of error to the charge are overruled.

In the trial below, we find

No error.