THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
STEVEN PAUL LINSCOTT, Defendant-Appellant.

First District (3rd Division)   No. 82—2927

Opinion filed August 7, 1985.

McNAMARA, J., dissenting.

Thomas D. Decker, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and
Kevin Sweeney, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Defendant, Steven Paul Linscott, was found guilty of murder in a
jury trial, and he was sentenced to 40 years in prison. He contends
that as a matter of law, the State did not prove him guilty beyond a
reasonable doubt. We agree, and we reverse the judgment of convic-

tion.

The victim, Karen Anne Phillips, 24 years old, lived alone in a studio apartment in Oak Park. On Friday, October 3, 1980, she attended nursing school at Rush-Presbyterian St. Luke's Hospital in Chicago. A classmate drove her home after class adjourned. Phillips then went to Kriya Yoga Temple in Chicago, where she was studying to be a swami. Phillips returned to her apartment about 10:30 p.m., at which time a friend, Helen Palella, telephoned to arrange a shopping trip for Saturday.

On Saturday, about 1 a.m., Phillips' next door neighbor, Mohammed Azedejn, heard pounding noises coming from Phillips' apartment. Azedejn knocked on Phillips' door and the noise ceased, but no one responded. After Azedejn returned to his apartment, the pounding noise resumed and then stopped.

Early Saturday afternoon, when Phillips did not show up for her shopping trip with Palella, Palella's husband went to Phillips' apartment to see if she was all right. When he failed to receive any response at the apartment, he contacted the Oak Park fire department. Shortly thereafter, fireman discovered Phillips' body in her apartment.

Oak Park police investigated the crime. They found Phillips' body lying face down on the floor with numerous wounds and abrasions. The body was naked except for a nightgown which was pushed up around the neck. The decedent's fingers were pressed together to form a hand signal, which in the Kriya Yoga religion signifies that the person was accepting death and seeking peace.

In addition, the police found foreign hairs in the decedent's hands, pubic region and on the carpet. Hair strands, blood samples, and vaginal, rectal and oral swabs were taken from the body. There was no evidence of a forcible entry into the apartment. A tire iron, encrusted with blood and hair, was found in some bushes outside the apartment. All of the evidence obtained by the investigating police officers was sent to the crime laboratory for analysis. Later, an autopsy revealed that the death was caused by a combination of beating and strangulation.

Defendant, 26 years old at the time of the occurrence, is a Bible student at Emmaus Bible College in Oak Park. He lives, with his wife and two children, a few houses from the decedent's apartment. Previously, defendant attended the University of Maine for two years and then joined the United States Navy. There, he became a radioman, and after background investigations, he was granted a top secret clearance. After an honorable discharge in March 1979, the Linscotts

lived in Maine. That fall they moved to Chicago, where defendant entered Emmaus. They spent the following summer in Maine and then moved to Oak Park a month before the occurrence. There is no criminality in defendant's history, and he had never been arrested before this occurrence.

With respect to the present case, on Friday, October 3, 1980, defendant's wife went to bed at 10 p.m. She does not know when defendant went to bed. However, she arose during the night and again at 6 a.m. to attend the children. On both occasions, defendant was sleeping in bed. On Saturday, area residents were questioned by the police regarding the murder. Defendant was told by the police that if he remembered anything unusual, "no matter how silly it might seem," he should report it to the police.

On Sunday, defendant told someone who worked in the building where he lived that he dreamed about a murder on Friday night. This person thought that defendant should contact the police about his dream. On Monday, defendant had a discussion with his wife about a newspaper account of Phillips' murder and about his dream. Defendant's wife thought that he should tell the police about the dream if he thought it might be helpful to the police.

After the discussion with his wife on Monday, defendant telephoned the Oak Park police and said that he had dreamed about a murder on the same night as the murder that had been reported. Defendant was told to write an account of his dream and that the police would contact him later. That evening, two police officers went to defendant's residence. They read defendant's account of the dream, and one of the police officers asked defendant why he had not described the murder weapon. According to the police officer, defendant had stated in the unrecorded telephone conversation that evening that defendant thought the murder weapon was a blunt object that looked like a tire iron. Defendant denied that he referred to the murder weapon as a tire iron, and he told the police officer that he had not described the weapon as a tire iron in his written account because he was uncertain what the object was in his dream.

Defendant told the officers that in his dream a man bludgeoned a woman to death. The man in the dream was approximately 20-30 years old, had straight blond hair, was light complected, had a somewhat husky build, and was approximately 5 feet 5 inches to 5 feet 7 inches tall. He was wearing brown trousers and a terry-cloth shirt with two or three stripes across the chest. In the first stage of the dream, the attacker was quiet and easygoing, but defendant noticed a change come over the person. Defendant then awakened, tried to

shake off the dream and fell back asleep. His dream continued with the man striking the woman on the head while she was lying or crouching on the floor. The victim had an air of acceptance even though she did not expect the attack, and she did not offer much resistance.

After hearing defendant recount his dream, one of the police officers noticed similarities between defendant's physical appearance and the physical characteristics of the attacker who appeared in defendant's dream. Defendant has straight blond hair, a light complexion, and a somewhat husky physique. He is just a bit under 6 feet tall. After concluding the interrogation, the police officers requested defendant's cooperation in the investigation, and defendant agreed.

Two days later, one of the police officers telephoned defendant and asked him to go to the police station. When defendant arrived at the police station, he was wearing a light colored terry-cloth shirt with a light colored stripe on a dark colored sleeve. He was taken to a conference room, where his conversation with two police officers was recorded.

In the conference room, defendant stated that on October 4, between 1 a.m. and 3 a.m., he had a vivid dream. The dream was about a ruthless beating. He said the attacker wore a white or off-white terry-cloth shirt with two red or purple stripes on the chest and one on the sleeve. He thought that the victim knew her assailant because they were at ease with one another. In response to a question, defendant said that he thought the victim was a religious person. When asked about her background, defendant said that she was somewhat intelligent, "at least high school and beyond a little bit." Defendant had the impression that the beating occurred close by in a living room which was the same size or larger than his four room apartment. He said the living room contained a couch and stereo. Defendant said that in his dream, the victim and the attacker talked for a while. Defendant did not know how long they talked or what was said. After a time, the attacker produced a dark, metallic instrument and began striking the woman in the face. The instrument was tapered down at one end and rounded at the other. Defendant was unsure what the instrument was, but he described it as a "counterbalance like a clock."

On October 10, defendant returned to the police station for another interview. This time an assistant State's Attorney was present. Defendant recounted his dream, and he then agreed to give the police blood, saliva, and head and pubic hair samples, which were sent to the crime laboratory for analysis. Later, defendant was charged with the crime.

■ In criminal cases, it is the State's responsibility to present direct or circumstantial evidence which proves that the defendant is guilty of the crime charged beyond a reasonable doubt. Direct evidence is evidence which, if believed, resolves a matter in issue without the necessity of an inference. Circumstantial evidence is evidence which serves as a basis from which the trier of fact may make reasonable inferences about a matter in issue.

In the present case, the State contends that it produced direct evidence that defendant was guilty because "the confession clearly proved defendant guilty of murder beyond any doubt." The State's reference to a confession is to defendant's declaration of his dream. However, a confession is a voluntary acknowledgement of guilt after the commission of an offense, and it does not embrace mere statements of independent facts from which guilt may be inferred. (*People v. Sowell* (1965), 56 Ill. App. 2d 110, 205 N.E.2d 487). In the present case, defendant never acknowledged guilt in relating his dream. Consequently, the State's attempt to elevate defendant's dream to the status of a confession fails because it ignores the very essence of a confession. It follows that the State did not produce any direct evidence of defendant's guilt.

■ We next address whether the State produced sufficient circumstantial evidence to prove that defendant is guilty beyond a reasonable doubt. When, as in this case, the State's evidence of guilt is entirely circumstantial, the defendant cannot be found guilty unless the facts or circumstances proved exclude every reasonable theory of innocence. *People v. Heep* (1922), 302 Ill. 524, 135 N.E. 64; Illinois Pattern Jury Instruction, Criminal, No. 3.02 (2d ed. 1981).

Here, the State argues that in relating his dream, defendant stated facts which only the killer could have known. In this regard, the State argues that defendant described the victim as a young, somewhat educated woman, who lived alone, and defendant stated that it appeared the victim knew her attacker and that the attack centered around the victim's head and shoulders. Also, the State argues that defendant was the only one who knew that the murder occurred in Phillips' living room at about 1 a.m. on October 4, and that there was a stereo in the room. We believe the State's conclusion that defendant had special knowledge of the crime is not supported by the evidence.

Defendant first told the police about his dream in a telephone conversation on Monday, October 6, two days after the body was found. Between the time that the body was found and defendant first recounted his dream to the police, the police had canvassed the residen-

tial area asking neighbors for clues regarding the victim's death. It is reasonable to assume that the neighbors who learned of Phillips' killing would have discussed it among themselves, and that whatever details they may have learned from the police would have been augmented by news media accounts of the murder. Moreover, much of the information to which the State refers appeared in a newspaper report of the murder before defendant told police about his dream. The newspaper article described the victim as a 24-year-old female, living alone and working as a nurse's assistant. The newspaper article used the word "bludgeoned," as did defendant in relating his dream. Also, the article indicated that the victim was struck by a blunt instrument and that she suffered a head wound. In addition, the newspaper article stated that the police suspected that the victim knew her attacker because there were no signs of forced entry into the apartment.

As for the other details which the State claims only defendant knew, defendant's account was either inexplicit or actually inconsistent with the facts. While defendant stated that his dream occurred between 1 and 3 a.m., he never indicated when the attack in his dream occurred. During police interrogations, when defendant was asked to give more details, he was unable to do so. Moreover, Phillips was white, whereas defendant thought that the victim in his dream was black.

In addition, in defendant's dream, the murder occurred in a living room that was as large as a four room apartment, but the murder actually took place in a 10- by 12-foot living area of a studio apartment. Also, in defendant's dream there was a couch in the murder scene, but Phillips did not have a couch. Further, while defendant denied observing any religious objects in his dream, Phillips did have a table which conspicuously displayed religious objects. The fact that Phillips had a stereo in her apartment and that there was a stereo in defendant's dream is not persuasive evidence that defendant had special knowledge regarding the murder, since stereos are common objects in young adults' apartments.

Other significant discrepancies between defendant's dream and the actual murder should also be noted. Defendant was charged with rape as well as murder. Although the jury found defendant not guilty of rape, there was evidence at trial which related to a possible criminal sexual encounter or rape. However, in relating his dream, defendant never mentioned any sexual encounter. Also, although the autopsy showed that Phillips' death was caused by a combination of beating and strangulation, there was no mention of strangulation in defendant's accounts of his dream.

At trial, the State produced testimony which established that the crime laboratory tests showed that the items tested "could have come" from defendant or were "consistent" with defendant's samples. However, no positive identification could be made from these tests. Although the test results were consistent with the characteristics of defendant, they were also consistent with the characteristics of a large segment of the population.

Finally, in determining whether the circumstantial evidence produced by the State is sufficient to prove that defendant is guilty beyond a reasonable doubt, we are mindful that no fingerprint evidence was introduced which connected defendant to the crime or any object related to the crime. Nor was any evidence introduced to connect defendant with the tire iron that was found by the police. Also, no evidence was introduced to show that anything in defendant's residence or wardrobe related to the crime. In addition, no tangible evidence was produced to show that defendant was ever in Phillips' apartment. Defendant denied that he knew Phillips, and there was no evidence produced which rebuts defendant's testimony. We do not suggest that it was necessary for the State to produce any of this evidence to prove defendant guilty beyond a reasonable doubt. However, in determining whether the circumstantial evidence which was produced here was sufficient, we believe that it is proper to consider, in light of all the facts and circumstances of the case, not only the evidence which was produced but also the absence of evidence which could have proved or disproved certain matters in issue.

We conclude that the circumstantial evidence produced by the State merely raises a possibility or suspicion that defendant is guilty. The evidence is plainly not sufficient to exclude every reasonable theory of innocence, which includes the possibility that defendant simply had a dream similar to the occurrence and that he acquired knowledge of additional facts through the news media or from neighborhood talk about the crime after a police canvass of the neighborhood.

Under the circumstances, we believe that as a matter of law, the State did not meet its responsibility to present direct or circumstantial evidence which proves that defendant is guilty beyond a reasonable doubt. While it was the province of the jury to weigh the evidence and determine the credibility of witnesses, a reviewing court will not hesitate to reverse a conviction which, as in this case, rests solely upon circumstantial evidence that merely raises a possibility or suspicion that defendant is guilty. If we did not reverse such a conviction, we would indeed be derelict in our duty as a reviewing court.

Accordingly, the judgment of conviction is reversed.

Reversed.

WHITE, P.J., concurs.

JUSTICE McNAMARA, dissenting:

I respectfully dissent. I believe that the State proved defendant guilty beyond a reasonable doubt.

Defendant's statements to the police exhibited knowledge of the crime which only the killer could have. Furthermore, his description of the killer strongly implicated himself. Defendant described the killer as having short, straight blond hair, having a light complexion, being between 5 feet 5 inches and 5 feet 7 inches, and square shouldered but not muscular. He was wearing a terry-cloth shirt with strips on the chest and sleeves. Defendant believed that the killer was married, had children, and lived in a nearby apartment. Defendant is white with straight blond hair, a medium build and just under 6 feet tall. He is married, has children, and lived near the deceased. During his first interview with the police, he wore a terry-cloth shirt with white stripes on the sleeves. According to defendant, he knew that the murder weapon was a dark, metallic object curved on one end and tapered on the other. This description was consistent with the actual murder weapon. Defendant also knew the attack occurred 5 to 6 feet from the apartment door, that the beating centered around the head and shoulders, and that blood was spattered all over. The marks and abrasions on the deceased's elbows and knees were consistent with defendant's statement that the victim had been beaten downward.

Defendant told the police that after his dream he checked his subconscious and checked his arms to see if his arms were sore because he thought the killer's arms had to be sore after such a violent beating. He also stated that the killer was eaten up with remorse and that his subconscious would give him away. He thought that the killer would leave a clue or telephone the police, but believed that if the police closed in, the killer would go into a shell. Defendant further stated that if his hairs were found in the victim's apartment, the devil placed them there.

I agree with the State that defendant's statements to the police were a confession. His statements, containing specific details of the crime, a psychological profile of the killer and an expression of concern about his hairs being found in the apartment, were not a recitation of a dream. The jury had the opportunity to observe the defendant, to hear his testimony, and to evaluate the testimony in light of all the other evidence. Their determination that defendant acquired infor-

mation about the murder, not through a dream, but because he was present, is very reasonable and understandable.

Furthermore, head hairs found at the scene of the murder were consistent with defendant's head hairs and defendant's expert witness agreed that the odds that two similar head hairs could have originated from different sources are one in 4,500. Defendant's pubic hairs were consistent with hairs found near the body of the victim, and defendant's expert witness agreed that the odds that two similar pubic hairs could have originated from different sources are one in 800. The blood tests which were performed also failed to exclude defendant. I believe that all the facts were inconsistent with any reasonable hypothesis of innocence, and that defendant was proved guilty beyond a reasonable doubt.

Since I do not believe that any of the other claimed errors warrant reversal, I would affirm the judgment of the circuit court of Cook County.