(No. 62304.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. STEVEN PAUL LINSCOTT, Appellee.

*Opinion filed October 17, 1986.—Modified on denial of rehearing December 1, 1986.*

RYAN, J., took no part.
CLARK, C.J., and SIMON, J., concurring in part and dissenting in part.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Joan S. Cherry, Thomas V. Gainer, Jr., and David A. Cuomo, Assistant State's Attorneys, of counsel), for the People.

Thomas D. Decker and Richard H. McLeese, of Thomas D. Decker & Associates, Ltd., of Chicago, for appellee.

JUSTICE MORAN delivered the opinion of the court:

Defendant, Steven Linscott, was charged with the rape and murder of Karen Anne Phillips, a 24-year-old student who lived near defendant. A Cook County jury found defendant guilty of murder but found him not guilty of rape. He was sentenced to 40 years' imprisonment. A majority of the appellate court reversed, finding that defendant was not proved guilty beyond a reasonable doubt. (135 Ill. App. 3d 773.) We granted the State's petition for leave to appeal (103 Ill. 2d R. 315).

A single question is presented for review: Was defendant proved guilty of murder beyond a reasonable doubt?

On October 4, 1980, Karen Anne Phillips was found dead in her apartment in Oak Park. Police found Phillips' body face down and naked, except for a nightgown around her neck. Her head was covered with blood, and there were numerous wounds on her body. The index finger and thumb on each of her hands were pressed together to form an "O".

A friend of the victim's, Helen Pallela, identified the "O" hand signals as "ommudras," symbols used in the particular Hindu denomination to which both Pallela and the victim belonged. Pallela, a swami at the Kriya Yoga

Temple in Chicago, explained that the "ommudra" signifies the search for peace and the passive acceptance of death.

Mohammad Azadejn, a student who lived in the apartment next to the victim, heard voices and pounding coming from the victim's apartment at about 12:45 to one o'clock on the morning of October 4. Although he could not make out what was being said, he thought it was some sort of argument. He knocked on the victim's door and received no answer. After going back to his apartment he again heard an argument, this time in whispers, and heard more pounding.

On the afternoon of October 4, Oak Park police canvassed the neighborhood, and spoke with defendant, who lived in the building immediately next to that of the victim. The police asked defendant and his wife if they had seen or heard anything strange at about one o'clock that morning. The police mentioned that someone had been murdered.

According to defendant, at this point he remembered a vivid dream from the previous night. The dream, which had occurred at about 1 a.m., involved a brutal beating. However, he did not mention the dream to the police at this time. Thereafter defendant discussed the dream with his wife and two friends, who advised him to tell the police about it and let them decide whether the dream was significant. On October 6, two days after the murder, defendant called the police, and briefly related the dream to Officer Robert Scianna of the Oak Park police department. At Scianna's direction defendant produced a written version of the dream, which Scianna picked up the following day. The next day, October 8, defendant came to the police station and gave the first of two tape-recorded interviews. In the first interview defendant described the dream to Officers Scianna and Ronald Grego, and, following Scianna's and Grego's re-

quests, defendant speculated on the possible characteristics and motivations of the assailant. Two days later, on October 10, defendant gave the second taped interview before Scianna, Grego, and Jim McCarter, an assistant State's Attorney. This second interview was mainly a repetition of defendant's earlier statements. Defendant then accompanied the officers to a hospital where he gave samples of blood, saliva, and hair. After returning from the hospital the officers accused defendant of committing the murder, a charge which defendant vehemently denied. Defendant was not arrested, however, until November 25, more than a month later.

The State's primary evidence at trial was defendant's own statements. In defendant's account his "dream" began with a man taking a few steps toward another person. Defendant could see the man quite well, but could not quite make out the other person. The two people engaged in what appeared to be an amicable conversation. However, defendant could not hear what was being said. After about 20 minutes of this conversation defendant noticed a sinister change come over the man, a change signalled by a "perverse" smile that suddenly appeared on the man's face. The man produced a metal instrument from behind his back and held it up. At this point defendant woke up, and walked around his apartment for a few minutes in an attempt to "shake it off." He thought he looked at his watch and remembered it being some time around 2 a.m. He then went back to sleep, and the dream resumed with the man in the process of beating the other person.

There were a number of parallels between defendant's statements and the actual crime. Officer Scianna testified that in his initial telephone conversations defendant had told him he thought the weapon in the dream had been a tire iron. The police in fact had found a bloodied tire iron in the bushes next to the victim's

building, and the blood and hairs on the instrument were found to be consistent with that of the victim. There were also several striking correlations between defendant's tape-recorded accounts of his "dream" and the evidence as to the actual murder. In defendant's dream the victim was beaten repeatedly, which was consistent with the actual victim's multiple wounds and bruises. Also, in defendant's dream the victim was beaten downwards, which was consistent with the position of the actual victim's corpse and the rug burns on her knees and elbows. Further, in defendant's dream blood was splattered all around the victim and attacker; blood was found splattered around the victim at the actual crime scene. In addition, in defendant's dream the victim passively accepted the beating. This fact is consistent with the presence of the "ommudra" hand signals, which are used to signify the passive acceptance of death.

The setting of the dream attack had some correlation to the actual crime scene, although there were also differences. In defendant's account of his dream the attack occurred in what appeared to him to be a "living room setting." Defendant said he thought that there was a couch in the room, and also said that "there might have been a stereo or something like that around. Not that I see that in my dream at all, but there was just that I had the impression that it was a living room and possibly it was something like that which would give me that impression." The actual victim was found in the main room of her studio apartment, which contained a stereo but no couch.

In addition, defendant's description of the dream assailant bore some resemblance to the defendant himself. He described the attacker as having short blond hair and a light complexion, and he thought the attacker had been wearing a short-sleeved terry-cloth shirt with stripes on the chest. At the time of his first tape-recorded state-

ment defendant, who has short blond hair and a light complexion, was wearing a short-sleeved knit shirt with terry cloth and stripes on the sleeves. However, the dream assailant was described as being between 5 feet 5 inches and 5 feet 7 inches, and was in his thirties, while defendant was about 6 feet tall and was 26 years old at the time of the murder.

In response to the police officers' suggestions that perhaps he had "psychic" powers, defendant agreed to speculate as to the attacker's personal life and psychological makeup. However, he repeatedly stated that there was nothing in the dream regarding these areas, and thus the best he could offer were guesses deduced from the visual images, and from his knowledge of psychology. When asked if the attacker was married defendant replied, "Well, it's a possibility *** if he's not married perhaps he's been married, because he seemed real at ease, you know, with the opposite sex, not like an older single fellow." When asked if the attacker had children he said that he did not know, but that it seemed that the attacker could have been a family man. When asked if the attacker had any remorse for his actions defendant stated "I would hope so, but it's probable that he's somewhat eaten out. He might be seared enough—conscious seared so that he can put it away." Asked if the attacker would "unconsciously want to be caught," defendant replied "I think so. I kind of think so—just my impressions of this guy *** I used to be a psyche major and I know that some people will do that subconsciously—leave a trace, you know." Later the police officers suggested that perhaps they could use defendant's psychic powers to get a message to the attacker. Officer Sciana asked, "How will we know that we got through to him *** I mean, is he going to call me up and say, hey, guess who I am?" Defendant responded that "It's a possibility. Stranger things have happened."

Defendant also attempted to describe the victim as best he could, but the description was very sketchy. At first he said that he was not sure of the victim's sex or features, since the dream "focused on [the attacker]." Later in the taped statements, however, he refers to the victim as "she" or "her." He also said that he "had the impression" that the victim might be black, a fact which did not correlate to the actual victim, who was white.

In addition to defendant's statements, the State introduced comparisons between physical evidence found at the crime scene and blood and hair standards taken from both defendant and the victim. Vaginal fluid taken from the victim showed type "O" ABO blood type only. This was consistent with a mixing of fluid from the victim, who had type "O" blood, and defendant, who has type "AB" blood but was a "non-secretor," *i.e.*, his ABO blood typing is not secreted into his other bodily fluids. However, 20% of the population are also nonsecretors, and the evidence was also consistent with the mixing of the victim's fluids with that of a "secretor" with type "O" blood, a category which includes nearly half of the population.

The State's expert also tested the vaginal fluid for two other blood identifiers called "gamma factors." However, because the victim's blood standard tested positive for the presence of both gamma factors, the expert admitted that the vaginal-fluid sample would also test positive for both factors regardless of the identity of the assailant.

Finally, the State's expert concluded that several of the head and pubic hairs found in the apartment were "consistent" with standards taken from defendant. A study referred to in the testimony found that only one in 4,500 people would have consistent head hairs when the hairs were tested for comparison of 40 different characteristics, and only one in 800 people would have consist-

ent pubic hairs. However, the State's expert could not remember which characteristics he had compared, and could remember only that he tested somewhere between eight and 12 different characteristics. In addition, he testified that several head-hair fragments and one pubic hair found in the victim's apartment had originated from a black person, and thus could not have originated from either defendant or the victim.

As this court stated in *People v. Collins* (1985), 106 Ill. 2d 237, 261, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267, "[w]hen presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant." It is the jury's function to assess the credibility of witnesses and to determine the weight of and inferences to be drawn from the evidence. (*People v. Bradford* (1985), 106 Ill. 2d 492, 502; *People v. Brisbon* (1985), 106 Ill. 2d 342, 360, *cert. denied* (1985), 474 U.S. 908, 88 L. Ed. 2d 241, 106 S. Ct. 276.) A reviewing court will only set aside a verdict when the evidence is so unsatisfactory as to raise a reasonable doubt as to the defendant's guilt. (*People v. Adams* (1985), 109 Ill. 2d 102, 115; *People v. Bradford* (1985), 106 Ill. 2d 492, 502; *People v. Brisbon* (1985), 106 Ill. 2d 342, 360.) The verdict will not be disturbed unless the evidence, viewed in the light most favorable to the prosecution, is such that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v. Collins* (1985), 106 Ill. 2d 237, 261.

In the present case we do not feel that the evidence is so unsatisfactory that no rational trier of fact could find the defendant guilty beyond a reasonable doubt. Defendant voluntarily came forward with an account of a "dream" that contained many unusual details which correlated with the actual murder. In particular, defendant's account of the beating, his knowledge of the murder weapon, and his knowledge of the victim's passive

acceptance of the attack showed knowledge of the crime which would not likely be available to anyone other than the murderer. In addition, the matching of defendant's hairs to those found at the crime scene, while not conclusive in itself, nonetheless provides additional support to the jury's verdict. Given this evidence the jurors need not have believed that defendant merely had a strangely coincidental dream, nor need they have believed that defendant had a genuine psychic experience. The evidence presented supports the conclusion that defendant's account of his "dream" was in fact revealing details of the actual crime from defendant's personal knowledge, and thus supports the inference that defendant was the murderer. Therefore the appellate court's decision, which overturned the jury's verdict, must be reversed. Other issues were raised by the defendant in the appellate court, however, and the cause is remanded to that court to consider them.

*Reversed and remanded,*
*with directions.*

JUSTICE RYAN took no part in the consideration or decision of this case.

CHIEF JUSTICE CLARK, concurring in part and dissenting in part:

Although this is a difficult case, I am compelled to disagree with the majority on its reversal of the appellate court. In my opinion the majority commits two errors. It applies the wrong standard of review, and it finds the evidence sufficient to sustain a conviction based on a mere suspicion of guilt.

First, the majority fails to distinguish between appellate review of convictions based upon direct evidence and appellate review of convictions resting wholly upon circumstantial evidence. Where the State's evidence is

wholly circumstantial, the defendant cannot be found guilty unless the facts or circumstances proved exclude every reasonable hypothesis of innocence. (*E.g.*, *People v. Lewellen* (1969), 43 Ill. 2d 74, 78 (stating rule, and applying to reverse conviction); *People v. Willson* (1948), 401 Ill. 68, 79 (stating as "unquestioned rule," and applying to reverse); *People v. Heep* (1922), 302 Ill. 524, 529-30 (stating, and applying to reverse); *People v. Ahrling* (1917), 279 Ill. 70, 80 (stating, and applying to reverse); see also *People v. Crow* (1985), 108 Ill. 2d 520, 523, 533-36 (failing to accept the People's contention that the court should abolish the distinction between direct- and circumstantial-evidence cases for purposes of appellate review); *People v. Whitlow* (1982), 89 Ill. 2d 322, 343 (acknowledging rule but holding that case included some direct evidence); *People v. Rhodes* (1981), 85 Ill. 2d 241, 249 (acknowledging rule but holding that fingerprint evidence excluded any reasonable hypothesis of innocence); *People v. Foster* (1979), 76 Ill. 2d 365, 373 (acknowledging rule but holding that State had excluded every reasonable hypothesis consistent with innocence).) Moreover, in a circumstantial-evidence case the evidence adduced must be conclusive and must produce a reasonable and moral certainty that the offense charged was actually committed and that the accused and no one else committed it. *People v. Taylor* (1984), 101 Ill. 2d 508, 515 (stating rule and applying rule to reverse conviction); *People v. Heep* (1922), 302 Ill. 2d 524, 529-30 (stating rule and applying to reverse); *People v. Ahrling* (1917), 279 Ill. 2d 70, 80 (same); see also *People v. Williams* (1982), 93 Ill. 2d 309, 322 (acknowledging application of rule to case where the evidence was "in large part circumstantial"); *People v. Weaver* (1982), 92 Ill. 2d 545, 555 (acknowledging rule but holding that evidence in case satisfied rule); *People v. Berland* (1978), 74 Ill. 2d 286, 308 (same).

The appellate court opinion relied on the "every reasonable hypothesis" rule because, under its analysis, the defendant's declaration of his dream was not a confession and thus was not direct evidence. The State's case was therefore considered wholly circumstantial. (135 Ill. App. 3d 773, 777.) It should be noted that the State did not contend that the dream declaration was direct evidence until the case was before the appellate court, and now apparently concedes that the evidence is wholly circumstantial.

Given this concession, it is strange that the majority opinion does not mention the applicable standard of review at all. It states: "A single question is presented for review: Was the defendant proved guilty of murder beyond a reasonable doubt?" (114 Ill. 2d at 342.) The opinion does not indicate whether it believes the dream declaration to be a confession or whether the evidence in the case is wholly circumstantial or partially direct. It does not cite either of the two rules applicable to wholly circumstantial-evidence cases. Nor does it cite any circumstantial evidence cases, omitting even *People v. Heep* (1922), 302 Ill. 524, which is cited in the appellate court opinion (135 Ill. App. 3d 773, 777).

The cases which the majority does cite are all, with one exception, cases in which the evidence was both direct and circumstantial, and which did not, therefore, require application of the "every reasonable hypothesis" and "moral certainty" standards. For example, in *People v. Collins* (1985), 106 Ill. 2d 237, 251-52, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267, the chief prosecution witness was himself a participant in the crimes charged and provided direct evidence that the defendants had committed them. In *People v. Bradford* (1985), 106 Ill. 2d 492, 496-97, 502, an eyewitness testified that the defendant engaged in lewd fondling and sexual intercourse with a minor. In *People v. Bris-*

*bon* (1985), 106 Ill. 2d 342, 350-51, 360-61, *cert. denied* (1985), 474 U.S. 908, 88 L. Ed. 2d 241, 106 S. Ct. 276, three eyewitnesses testified that the defendant committed the murder charged. While in *People v. Adams* (1985), 109 Ill. 2d 102, 115-16, it could be argued that the evidence was wholly circumstantial, there the court explicitly referred to the reasonable-hypothesis-of-innocence-standard. 109 Ill. 2d 102, 115.

This is not to say that the propositions for which the majority does cite these cases are inaccurate, or that they are inapplicable to circumstantial-evidence cases. But the lack of any reference to the usual standards for deciding circumstantial-evidence cases is troubling. If the majority seeks to abolish the direct-circumstantial distinction for purposes of appellate review, it should state that holding directly. If, on the other hand, it believes the dream declaration was a confession, and therefore direct evidence, it should also so hold. I believe neither decision would be correct.

It seems clear that the dream cannot be considered a confession. To constitute a confession, a statement must be a voluntary acknowledgement of guilt, embracing all necessary elements of the crime; and not merely an admission of incriminating facts. (*People v. Sowell* (1965), 56 Ill. App. 2d 110, 117-18, citing *People v. Sovetsky* (1926), 323 Ill. 133, 137.) The defendant here never acknowledged that the supposed dream was actually a recollection of his own commission of the crime, or even that he identified himself with the dream killer. Therefore, his dream declaration was not a confession. Accord, *Commonwealth v. Maltais* (1982), 387 Mass. 79, 438 N.E.2d 847.

While our appellate court has held that certain exculpatory statements of the defendant, not amounting to confessions, may be considered direct evidence (*People v. Frazier* (1984), 129 Ill. App. 3d 704, 707; *People v. Gar-*

*cia* (1981), 95 Ill. App. 3d 792, 796; *People v. Triplett* (1980), 87 Ill. App. 3d 763, 770; *People v. Spataro* (1978), 67 Ill. App. 3d 69, 75; *People v. Fletcher* (1976), 40 Ill. App. 3d 537, 542, citing *People v. Brown* (1974), 56 Ill. 2d 312, 317-18, *rev'd and remanded on other grounds* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254), such statements will only be considered direct evidence if they establish defendant's participation in the crime or an element of the offense (*People v. Frazier* (1984), 129 Ill. App. 3d 704, 707-08). Here, the defendant's statements do not establish his participation. All of the statements purport to represent a dream rather than a recollection of an actual event in which he participated. The jury might have inferred either that the dream reflected his prior participation in the actual crime or that he was couching an admission of guilt in the form of a dream account. Either inference is so attenuated that the "dream" itself, however interpreted, cannot be considered direct evidence of guilt.

Moreover, the majority's tacit abolition of the distinction between the differing standards of review for circumstantial- and direct-evidence cases should be rejected, and the distinction between the standards of appellate review appropriate to the two different types of cases should be preserved.

Circumstantial evidence is evidence from which the fact finder can draw an inference which supports the ultimate legal conclusion. Direct evidence is evidence which supports the ultimate conclusion without the use of inferences or without the use of any inference but the most commonplace and widely accepted. Thus, if a witness testifies to seeing X with a gun in hand aiming at Y, hears a loud noise, and sees Y fall to the floor, that witness has provided direct evidence of X's guilt. If, on the other hand, a witness who does not see the murder should find X's gun on the floor with X's fingerprints on

it, and Y dead beside the gun, that witness has provided only circumstantial evidence. In the first case, the trier of fact who believes the witness need only employ the ordinary inference that the witness' sense perception reflected reality, and that the perception described will usually signify the initial aiming of a gun, its discharge, and the subsequent flight of a bullet which strikes the victim. In the second case, the trier of fact must not only believe the witness but must also infer from the fingerprint and ballistic evidence that the defendant, in an act seen by no eyewitness, fired the gun. This conclusion must rest on more remote inferences about the accuracy and reliability of scientific evidence, and must exclude as unreasonable the inference that some third party stole the gun, faked the fingerprints, and falsely implicated the defendant.

While these differences between the two types of evidence are not differences in kind but in degree, they do suggest that the task confronting a jury in dealing with the two types of evidence is different. It is true, as has often been noted, that circumstantial evidence may actually be stronger than direct evidence. The volume and quality of circumstantial evidence can render it more probative than the direct testimony of an obviously incredible witness. However, this does not mean that appellate review of the two types of evidence should be identical.

Where the jury's verdict depends partially upon direct evidence, the function of an appellate court must be quite limited. Where direct evidence is introduced, the outcome will normally depend upon judgments as to the credibility of witnesses. These judgments, in turn, will rest heavily upon demeanor evidence unavailable to the reviewing court. We cannot hear the tremor in a witness' voice, or see the sweat on his palms.

This is not to say that a verdict based upon direct ev-

idence may never be overturned. In the rare case, the witness' testimony may so contradict known facts or physical laws that it may safely be adjudged incredible as a matter of law. If a witness should testify, for example, that he saw the defendant rise from the floor like a soap bubble and remain suspended in midair, we can safely say that his testimony is incredible as a matter of law. However, in the ordinary case, the credibility of an individual witness is best left to the jury.

Cases based wholly upon circumstantial evidence are clearly different. In these cases, the verdict rests not only upon judgments as to the credibility of witnesses, but also upon the reasonableness of inferences drawn from the facts presented. Problems stemming from our inability to recapture demeanor evidence simply do not arise.

It is true that, even in a circumstantial-evidence case, counsel is free to attack the credibility of the witnesses through whom the circumstantial evidence is introduced. However, in such a case, the jury must not only assess the credibility of the witnesses but also must make reasoned inferences from the witnesses' testimony, even assuming they find that testimony wholly credible. Those inferences which the jury draws from the testimony should be subject to review to determine if every reasonable competing inference of innocence can be excluded. Determination of the reasonableness of such inferences, unlike credibility, does not depend upon demeanor evidence at all. Therefore, that determination is clearly within the competence of the reviewing court.

While we have recently held that juries need not be given the reasonable-hypothesis instruction (*People v. Bryant* (1986), 113 Ill. 2d 497), the considerations outlined above convince me that the reasonable-hypothesis standard should not be similarly abandoned, at least not without separate and detailed discussion.

Second, using the proper standard, the evidence adduced here does not exclude a reasonable hypothesis of innocence. Nothing in the dream account refutes the reasonable hypothesis that the defendant experienced a dream which bore a coincidental similarity to the actual murder.

The voluntary declaration of a dream cannot by itself establish guilt beyond a reasonable doubt. (*State v. Johnson* (N.C. App. 1986), 338 S.E.2d 584, 585-87.) However, the majority relies upon certain "unusual" details taken from the defendant's description of the dream to buttress its conclusion that the description reflects personal knowledge of the crime.

The majority opinion relies on these similarities between the murder and the dream:

(1) the defendant dreamed the victim was beaten repeatedly while the actual victim was also beaten repeatedly;

(2) in the dream the victim was beaten downwards, an account consistent with the forensic evidence of rug burns;

(3) in the dream the weapon used was described as long and thin; the actual murder weapon was a tire iron;

(4) in the dream, the defendant did not note that the victim resisted; the defendant was found making a "ommudra" sign used to signify the passive acceptance of death.

The majority also relies on forensic evidence that hairs found at the scene "matched" the defendant's.

The description of any of the details as "unusual" or "strangely coincidental" defies common sense. Tire irons are not an unusual weapon. Many people who are beaten to death suffer multiple wounds. It is also probable that most beatings take place "downwards," particularly if

the attacker is taller than the victim, or if the victim does not remain standing before death. It is difficult to agree that any of these details is so "unusual" as to preclude the reasonable hypothesis that it was the product of fantasy rather than personal knowledge of the crime.

All of this evidence was so lacking in probative value that a reasonable hypothesis of innocence cannot be excluded. The forensic evidence, as presented, was so weak as to lack all probative value. The expert testified to a 4,000 to 1 probability of a match but then admitted that this probability would need testing of 40 characteristics. He tested only 10 to 12, and could not remember which. In addition, the victim's apartment also contained hairs of another unidentified male, not the defendant.

The only truly unusual detail lies in the victim's passive acceptance of death. Here, however, while the dream includes this unusual event, there is little evidence that the event actually occurred. The victim's supposed passivity is based solely on her "hand-signal." To give this account credence, the jury would have to discard the reasonable hypotheses that the victim's fingers came together in her death throes without any conscious act, or that the victim made the signal but actually did struggle against her attacker, or that she made the signal for some other unknown reason. Given the many unexplained discrepancies between the dream and murder, this one coincidence did not entitle the jury to find the defendant guilty beyond a reasonable doubt.

I would have affirmed the appellate court and found that the defendant was not proved guilty beyond a reasonable doubt.

JUSTICE SIMON, also concurring in part and dissenting in part:

I concur in the court's remand of the cause to the appellate court to consider the other issues raised by the

defendant. I dissent, however, from the finding of the court that the evidence is sufficient to prove the defendant guilty beyond a reasonable doubt.

While the majority correctly states that it is not the function of the court on review to assess the credibility of witnesses, its opinion ignores the court's duty to review the reasonableness of inferences the jury draws in reaching its conclusion that a defendant is guilty beyond a reasonable doubt. Chief Justice Clark accurately points out that because the evidence in this bizarre case is wholly circumstantial, we are reviewing only the jury's inferences, not its evaluation of demeanor evidence. The inferences drawn in this case are so tenuous that the defendant's guilt cannot be established so "as to exclude every other reasonable hypothesis." (*People v. Garrett* (1975), 62 Ill. 2d 151, 163.) Linscott's conviction therefore should not stand. 62 Ill. 2d 151, 163; see also *People v. Heep* (1922), 302 Ill. 524; *People v. Widmayer* (1948), 402 Ill. 143.

The majority emphasizes the similarity between the defendant's account of his dream and the circumstances surrounding the murder. My colleagues overlook, however, that much of this information appeared in a newspaper account of the victim's death, and that the defendant discussed this article with both his wife and a friend prior to calling the police. The article, which appeared on the second page of the October 6, 1980, Chicago Tribune, stated that the victim was "bludgeoned to death with a blunt instrument." The story also mentioned that police suspected that the victim and her assailant knew one another. The defendant, in his written statement to police on October 6, 1980, used similar language to describe the attack. The defendant wrote that he "saw a man bludgeon a person to death." In addition, the defendant mentioned that the assailant's weapon was a heavy blunt instrument. After further questioning by po-

lice, the defendant surmised that the victim and her assailant must have known each other since they appeared to feel comfortable together. In addition, we have no way of knowing what information the defendant might have picked up from the neighborhood discussion of the murder before he approached the police.

According to the majority, there were other similarities between the defendant's dream and the attack which only the murderer could have known. The majority places great emphasis on Linscott's alleged description of the murder weapon as a tire iron. Linscott denied making the statement. A police officer contended, however, that Linscott referred to the murder weapon as a tire iron in his initial phone call to police. Not only has the State failed to either offer a tape recording of this call into evidence or even produce one, but also the first written report of this call was made by the police officer only after Linscott was arrested—seven weeks after the phone conversation took place. Moreover, throughout the recorded interrogations made subsequently to his phone call to the police, Linscott consistently refers to the weapon as a blunt instrument resembling the "counterbalance of a grandfather clock," about 8 to 9 inches long. Had Linscott actually described the weapon as a tire iron in his phone conversation, it is curious that throughout the subsequent interrogations the police never confronted him with this inconsistency. Further, the State ignores that the actual murder weapon was 25 inches long—about three times the length of the blunt instrument used in Linscott's dream.

The other so-called striking similarities are: the account of the beating, the victim's passive acceptance of the attack, and the presence of a stereo at the scene of the crime. The majority, however, incorrectly assesses the significance of these coincidences. As Chief Justice Clark notes, "beating downwards is the usual way to in-

flict blows." Further, the victim's passive acceptance of death was based solely on a hand signal. From the evidence presented, it is far from clear that the victim's death was passive. Clothing was strewn around the room, and a TV set was overturned. This evidence is more consistent with a theory that a struggle ensued. Finally, the significance of the presence of a stereo in both the dream and at the murder scene eludes me. As Justice Rizzi noted in the appellate court's sound opinion (135 Ill. App. 3d 773), ownership of a stereo is so common that it is hardly remarkable that in a dream about a room and in real life a stereo was included.

More striking than the similarities between the dream and the real murder are the differences. The victim in the dream was black, not Caucasian as was the real victim. The attack in the dream took place in the living room of a three- or four-room apartment. The actual murder, however, took place in a studio apartment containing a bed and a display of religious objects, not the couch present in the defendant's dream. Moreover, the assailant in the dream was far shorter than the defendant.

But even supposing that this dream evidence could prove that the defendant caused the victim's death, it is still insufficient to support a murder conviction. To convict a person of murder all of the elements of the crime must be established. Linscott's dream, even when interpreted most favorably to the prosecution, does not establish that he killed the victim either intentionally or knowingly. (See State v. Petree (Utah 1983), 659 P.2d 443-47.) In the dream the attacker talked to the victim for some time before a "perverse smile" came over his face. We are not sure from this account whether the dream murderer knew what he was doing or what motivated the assault. More importantly, however, "[w]hat a dream means, if anything, presents an occurrence filled with mystery. As to the meaning of a dream, we can only con-

jecture." (*State v. White* (1967), 271 N.C. 391, 394-95, 156 S.E.2d 721, 724.) Dream evidence of the type the State offers here is simply too ambiguous to support a murder conviction.

The majority also relies heavily on forensic evidence to buttress the jury's findings. Blood samples taken from the victim's vaginal fluid indicated that her assailant could have had type "O" blood which is found in about 50% of the population. Evidence regarding hair strands found at the scene is far from sufficient to establish, even in conjunction with other evidence, that the defendant is guilty beyond a reasonable doubt. Not only was the State's expert witness confused as to how many characteristics were tested, but also "comparative microscopy of hair *** serves to exclude classes of individuals from consideration and is conclusive, if at all, only to negative identity." (*State v. Stallings* (1985), 77 N.C. App. 189, 191, 334 S.E.2d 485, 486; see also 23 A.L.R.4th 1199, 1210 (1983).) Hence such evidence is of little assistance in proving the defendant guilty.

Finally, two other factors create substantial doubt regarding Linscott's guilt. First, there was evidence indicating that the victim knew her assailant, there being no sign of a forced entry into the apartment. Both the State and the defense agree, however, that the victim and Linscott did not have any sort of relationship or even knew each other. Second, Linscott had no motive for killing the victim. "While the State is not required to prove a motive for a deliberate criminal act, the presence of a motive is important in considering the question whether the defendant did commit the act." *People v. Richards* (1970), 120 Ill. App. 2d 313, 316, citing *People v. Novotny* (1939), 371 Ill. 58.

The evidence, at best, as a matter of law leaves a reasonable doubt regarding Linscott's guilt, and I would, therefore, reverse the conviction.