THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
STEVEN PAUL LINSCOTT, Defendant-Appellant.

First District (3rd Division) No. 82—2927

Opinion filed July 29, 1987.

McNAMARA, P.J., dissenting.

Thomas D. Decker & Associates, Ltd., of Chicago (Thomas D. Decker and Richard H. McLeese, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., and David A. Cuomo, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:
Defendant, Steven Paul Linscott, was charged with the rape and murder of Karen Anne Phillips. A jury found him guilty of murder but not guilty of rape, and he was sentenced to 40 years in prison. On appeal, we reversed the conviction on the basis that the State did not prove defendant guilty beyond a reasonable doubt; one judge dissented. (*People v. Linscott* (1985), 135 Ill. App. 3d 773, 482 N.E.2d 403.) The supreme court granted the State's petition for leave to appeal and reversed our decision; two judges concurred in part and dissented in part.[1] (*People v. Linscott* (1986), 114 Ill. 2d 340, 500 N.E.2d 420.) The supreme court remanded the case to us to consider other issues raised by defendant which we had not previously addressed. We reverse and remand for a new trial, with directions.

This is an unusual case. Defendant was convicted of murder solely on the basis that (1) he had a dream that was similar to the occurrence, but with some discrepancies; (2) the defendant has a blood type that makes him a member of a substantial percentage of the male population, or possibly the entire population, who could have been the assailant; and (3) the State's expert witness could not exclude the possibility that several head hairs found in the victim's right hand and at the scene, and two pubic hairs combed from the victim, were from the defendant. There was no evidence from a factual witness connecting

---

[1]Chief Justice Clark and Justice Simon dissented from the majority's reversal of the appellate court decision, but concurred in the majority's decision to remand the case to the appellate court to consider the other issues.

defendant to the crime; no fingerprints connecting defendant to the crime; nothing to connect defendant with the murder weapon; no prior relationship between the victim and defendant; and no motive. Nor is there any criminality in defendant's background. These facts are stated here simply to illustrate that the case is close on the merits, and not to resurrect the question of whether the evidence at trial was sufficient for a jury to conclude that defendant was guilty beyond a reasonable doubt. The detailed facts of the case as they generally appear in the first appellate court opinion and the supreme court opinion are reproduced in an appendix to this opinion.

■■ We believe that the prosecutor's closing arguments to the jury, relating to blood and hair comparisons, were so egregious that a denial of a fair trial resulted.[2] We also believe that substantial rights are affected because the evidence is so closely balanced. Thus, we apply the plain error doctrine to review the error, although there were no objections made to the prosecutor's closing arguments in the trial court. *People v. Harden* (1986), 113 Ill. 2d 14, 19, 495 N.E.2d 490, 493; Supreme Court Rule 615(a) (107 Ill. 2d R. 615(a)).

Some background information is necessary to understand what occurred with respect to the prosecutors' closing arguments. Prior to trial, without giving notice to defendant or the court, the prosecution's expert witness at trial, Mohammed Tahir, of the Illinois Department of Law Enforcement Crime Laboratory, performed, or ordered, a test which destroyed the only vaginal swab that was taken from the victim. The destructive test was done after defendant had been indicted for the rape and murder of the victim, and after defendant had moved for discovery of all physical evidence.

■■ Tahir testified at trial that the no longer existent vaginal swab had a mixture of secretions which included vaginal and seminal material, and that he tested the mixed secretions for a blood type. Tahir also testified that his tests revealed there was type O blood in the mixed secretions. Tahir explained that 20% of the population are considered nonsecretors, people whose ABO blood type cannot be detected in their body fluids, such as saliva, semen or vaginal fluids. Secretors, 80% of the population, disclose their blood groupings in body fluids. The victim was a secretor, with type O blood. Nearly half of the population has type O blood, including secretors and nonsecretors.

---

[2]The case was tried by dual prosecutors, with one prosecutor making the opening closing argument and the other prosecutor making the rebuttal closing argument to the jury. For convenience we shall merely use the term prosecutor when referring to either or both of the prosecutors.

Defendant is a nonsecretor with type AB blood.

Blood can also be classified by Gamma Marker identifications which are detected by an electrophoresis test.[3] The victim's blood contained Gamma Markers Plus 1, Plus 2 and Plus 10. Defendant's blood has Gamma Markers Minus 1, Minus 2 and Plus 10. Tahir tested the vaginal swab for the precise Gamma Markers that were found in the victim's blood, Plus 1, Plus 2 and Plus 10. He testified that his test showed that the mixed secretions on the vaginal swab contained Gamma Markers Plus 1 and Plus 2, but that his test for Gamma Marker 10 was inconclusive.

Positive Gamma Markers mask negative Gamma Markers. Thus, the seminal material that was part of the mixed secretions on the vaginal swab could have come from a secretor with the same type O blood and Plus 1 and Plus 2 Gamma Markers as the victim, or from a secretor with the same blood type as the victim and Gamma Markers Minus 1 and Minus 2 or any combination of Plus and Minus Gamma Markers 1 and 2. It follows that the seminal material that was part of the mixed secretions on the vaginal swab could have come from any male with type O blood (secretor or nonsecretor), or from any male who is a nonsecretor, regardless of blood type. These two groups comprise a substantial percentage of the population, for they include the males in an indeterminate mixture of nearly half the population (type O blood) and 20% of the population (nonsecretors). This substantial percentage of the population would include the defendant, a nonsecretor with type AB blood.

Tahir did not testify that the victim was sexually abused, and there is no such evidence or testimony from anyone. Thus, it is possible that the victim was not raped. Tahir testified that "you cannot tell how long the stain [i.e., seminal material] was deposited," and there was no way that he could tell "whether or not this girl had sexual intercourse within 24-hours of the time" that she was murdered. Thus, if the victim was not raped, but rather, had a consensual sexual encounter prior to meeting her assailant, and the seminal material that

---

[3]A Gamma Marker is an antigenetic marker that is present on certain molecules in the blood and certain body fluids, such as saliva and seminal fluids. To date, there are about 25 such markers that can be identified on the surface of three (hence, the use of the word Gamma, which is the third letter of the Greek alphabet) immunoglobulin molecules. A Plus 1 Gamma Marker means that the test for Gamma Marker 1 was performed, and Gamma Marker 1 was present. A Minus 1 Gamma Marker means that the test for Gamma Marker 1 was performed, and Gamma Marker 1 was not present. It is for this reason that in a mixed secretion, a Plus Gamma Marker masks a Minus Gamma Marker.

remained from that encounter was part of the mixed secretion on the vaginal swab, then the assailant could have been anyone in the world, male or female, regardless of blood type. This conclusion comports with the State's position in this appeal. In its supplemental brief, the State declares: "Mr. Tahir testified that he could not determine the age of the sperm, which means that the sperm could have been donated by someone other than the murderer." We agree with that possibility.

One must be mindful of all the possibilities that we have mentioned because the prosecutor's argument to the jury relating to blood comparisons was false and a stark distortion of the possibility that the defendant was the assailant. The prosecutor told the jury:

"Karen was raped by a non-secretor and the defendant is a non-secretor.

\* \* \*

Seminal material. One fact it came from a non-secretor. Mr. Linscott is a non-secretor."

No one testified that "Karen was raped by a non-secretor" or that the seminal material "came from a non-secretor." The prosecutor simply made up that piece of "evidence." The made-up evidence was doubly devastating because not only was it false, but it reduced the pool of possible assailants from a substantial percentage of the male population, or even from the entire population, to just the males in 20% of the population. Defendant, being a nonsecretor, is within that 20% group created by the prosecutor in his argument to the jury. The prosecutors' evidence aliunde on blood comparisons was so unfair that we cannot give it even the slightest appearance of judicial condonation, and it deserves "the strongest condemnation." *People v. Lyles* (1985), 106 Ill. 2d 373, 411, 478 N.E.2d 291, 303.

■ At trial there was also testimony relating to head hairs that were found in the victim's right hand, and on carpet where the victim was found. In addition, there was testimony about pubic hairs, not belonging to the victim, that were combed from the victim's pubic region. There was also testimony about a pubic hair that was found on carpet where the victim was found, and several head hairs that were found on the victim's bed sheet. According to the State's evidence, the pubic hair that was found on the carpet and the several head hairs that were found on the bed sheet were from a black person, and, therefore, they could not have come from the victim or the defendant. The victim and the defendant are white. According to Tahir's testimony, race can be determined by hairs, but neither sex nor age can be determined by hairs.

Tahir compared 15 to 20 head hairs and 2 pubic hairs from the defendant, with "several hairs" that were found in the victim's right hand, a "few hairs" that were found on the carpet, and 2 pubic hairs that were combed from the victim's pubic region. Tahir testified variably that he looked at approximately 7, 8, 10, or a dozen characteristics in making his comparisons. He also testified that he made no cross-section hair comparisons because he did not feel that cross-section hair comparisons are helpful.

The strongest hair testimony that Tahir gave to support the State's case against defendant is that defendant's hair samples were "consistent" with the hairs to which he had compared them, and that therefore he could not exclude the possibility that the hairs that were found were from the defendant. However, Tahir also testified that if hairs from other persons had been submitted to him for comparison, they could also have been "consistent" with the hairs that were found.

Tahir did not testify that the hairs matched or that they were identical. Moreover, any reasonable reading of Tahir's testimony establishes that Tahir did not intend his testimony to mean that the hairs were consistent in the sense that they matched or were identical. Specifically, when the prosecutor attempted to get Tahir to state that the hairs that were found and defendant's hairs matched, Tahir very carefully avoided testifying that they matched:

"Q. So again all we are talking about is that they match in every respect, is that correct?

A. They were consistent."

The "So again" reference in the prosecutor's question was a misleading reference because Tahir had never testified that the hairs matched.

Likewise, the defense expert, Kenneth Siegesmund, did not testify that the hairs matched or that they were identical. He testified that the hairs that were found either did not come from defendant or had too few characteristics displayed for him to conclude that they matched or did not match defendant's hairs. However, with respect to whether the pubic hairs that were found were defendant's pubic hairs, Siegesmund was very specific. He testified:

"Q. In view of the testing that you have just described with respect to the pubic hairs, based upon your observations and findings and analysis, do you have an opinion, based upon a reasonable degree of scientific certainty as to whether or not the pubic hair taken from the combings of Karen Phillips and the pubic hair samples of Steven Linscott came from a common source?

A. Yes, I do.

Q. What is your opinion, Doctor?

A. Within a reasonable degree of certainty, I believe that the hair from the combings did not come from the same source as the hair from the suspect."

Thus, there is no testimony anywhere in the record that any of the hairs that were found and the defendant's hairs matched or were identical. As a matter of fact, as previously shown here, the prosecutor's expert witness plainly refused such a suggestion. Notwithstanding this clear manifestation of the evidence at trial, the prosecutor told the jury in his rebuttal closing argument:

"He says you must ask yourself where is the link. The link is the semen matching the non-secretor. Mr. Linscott is a non-secretor.

The like hairs, more than one, more than two, more than three and you heard the probabilities from his own expert. Pubic hair in the woman's crotch matching Mr. Linscott.

* * *

I would suggest to you Ladies and Gentlemen if I said there were two American flags right there and they were both twelve by eight and that they had the same number of stars and they had the same number of stripes and had the same coloring would you sit there and say well there is nothing dissimilar about those two, they are identical.

But not a scientist. A scientist will state that every aspect that I examined they were consistent. And what does that mean. There was nothing different. And to a layman it means identical as the two American flags."

Thus, not only did the prosecutor in his rebuttal closing argument reinforce his prior misrepresentation to the jury that there was evidence that the seminal material on the vaginal swab was from a nonsecretor, but the prosecutor also told the jury that there was evidence that the defendant's pubic hairs and the pubic hairs that were combed from the victim matched and were identical. Plainly, Tahir did not testify, and he did not intend his testimony to mean, that the hairs that he compared matched or were identical when he said that they were "consistent." Comparative microscopy of hair serves to exclude classes of individuals from consideration and is conclusive, if at all, only to negate identity. (*State v. Stallings* (1985), 77 N.C. App. 189, 191, 334 S.E.2d 485, 486; see also 23 A.L.R. 4th 1199, 1210 (1983).) Here, by wrongfully telling the jury that the defendant's pubic hairs and the pubic hairs that were combed from the victim matched and were identical, the prosecutor used the comparative microscopy of hair by Tahir as conclusive evi-

dence of identity. It follows that the prosecutor's message to the jury was not only a distortion of Tahir's testimony, but also a distortion of the meaning of the evidence. The prosecutor's choice of words was clever, but definitely misleading. Gamesmanship has no place when a person's liberty is on the line. There is simply too much at stake.

During the prosecutor's cross-examination of defendant's expert, Siegesmund, the prosecutor asked Siegesmund if he was aware of a study conducted by Barry Gaudette, a forensic scientist. (See Gaudette, *An Attempt at Determining Probabilities in Human Scalp Hair Comparison*, 19 J. Forensic Sci. 599 (1974).) The prosecutor also asked Siegesmund if he was aware that Gaudette's study found that only 1 in 4,500 people would have consistent head hairs when tested for comparison, and that only 1 in 800 people would have consistent pubic hairs when tested for comparison. Siegesmund answered that he was aware of Gaudette and his study, but that whether Gaudette's figures would apply to any particular situation would depend on how many hairs were being compared, and whether all the tests that Gaudette recommends were performed. Siegesmund did not testify that the 1 in 4,500 or the 1 in 800 figures would be applicable to the hair comparisons that were made by Tahir in this case. No one testified that the figures used in Gaudette's study would be applicable to the hair comparisons that were made in the present case. Nor did anyone testify that the figures used in Gaudette's study would have general application to hair comparisons. In fact, Siegesmund's testimony, which was the only testimony at trial on this point, clearly shows that just the opposite is true.

Plainly, the figures from Gaudette's study do not have general application to hair comparisons. In his study, Gaudette admonishes that the odds to which he makes reference "should not be applied blindly to all cases." (Gaudette, *Some Further Thoughts on Probabilities and Human Hair Comparisons*, 23 J. Forensic Sci. 758, 759 (1978).) This admonishment is critical here because there is no evidence that Tahir made the same number of hair comparisons that were made in Gaudette's study. Also, Tahir testified that he could not remember which characteristics he had compared, and he could remember only that he tested somewhere between 8 and 12 different characteristics.[4] Moreover, Tahir made no cross-section hair comparisons for this case,

---

[4]In his closing argument, the prosecutor told the jury that Tahir checked for "eighteen points" of comparison. However, Tahir did not testify that he checked for eighteen points or characteristics of comparison. In its brief, the State says that Tahir "checked for approximately 12 identifying characteristics."

although Gaudette warns: "The importance of examining hairs in cross section, in addition to whole mount, *was demonstrated by this study*. Of the 861 hairs studied, 163 cross sections were required to gain additional characteristics for differentiation." (Emphasis added.) (Gaudette, *An Attempt at Determining Probabilities in Human Scalp Hair Comparison*, 19 J. Forensic Sci. 599, 605 (1974).[5]) In comparing human scalp hairs, Gaudette utilized a table of 23 characteristics for comparison, including 16 longitudinal characteristics and seven cross-section characteristics. (Gaudette, *An Attempt at Determining Probabilities in Human Scalp Hair Comparison*, 19 J. Forensic Sci. 599, 601 (1974).) In a summary of this study, Gaudette states, "366,630 comparisons were made between 861 hairs from 100 different individuals." (Gaudette, *An Attempt at Determining Probabilities in Human Scalp Hair Comparison*, 19 J. Forensic Sci. 599, 605 (1974); see Gaudette, *Some Further Thoughts on Probabilities and Human Hair Comparisons*, 23 J. Forensic Sci. 758, 759 (1978).) In comparing human pubic hairs, Gaudette utilized a table of 26 characteristics for comparison, including 19 longitudinal characteristics and seven cross-section characteristics. In a summary of this study, Gaudette states, "101,368 comparisons were made between 454 hairs from 60 different individuals." Gaudette, *Probabilities and Human Pubic Hair Comparisons*, 21 J. Forensic Sci. 514-17 (1976).

■ Notwithstanding the plain fact that the figures from Gaudette's study have no application to the hair comparisons that were made in this case, and the fact that the figures from Gaudette's study do not have general application to hair comparisons, the prosecutor told the jury:

"Then *I asked him* [Siegesmund] if he was aware of the Chief Forensic Scientist for the Royal Canadian Mounted Police, Mr. Gaudette. And the man says yes, of course, he is the leading man in his field. *And I asked him* are you familiar with the figure formula by this man and those were that of any two head hairs matched from two separate individuals it occurs in one out of every forty-five hundred times.

*I asked* Mr. Siegesmund are you also familiar with the fact that one person may have the same head hair does not necessarily mean that he has the same pubic hair and that the pubic hair ratio in any two people matched are one in eight hundred

---

[5]We note that it was the prosecutor who first brought up the subject of Gaudette's study, on cross-examination of Siegesmund. Therefore, we assume that the prosecutor was fully aware of what is stated in Gaudette's study.

and I leave it to you, Ladies and Gentlemen of the jury, to figure out the probability or likelihood of anybody having the same head hair and the same pubic hair. It is a figure of one out of every forty-five hundred and one out of every eight hundred." (Emphasis added.)

To us, as judges, what the prosecutor did is readily apparent. He misled the jury by recalling only his questions to Siegesmund and ignoring Siegesmund's answers. Based on the evidence at trial, the 1 out of every 4,500 and 1 out of every 800 figures from Gaudette's study should not have been considered by the jury. Yet, that is precisely what the prosecutor told the jury to do. This appears to have been a calculated, rank misrepresentation. The prosecutor's message to the jury was a distortion of the witness' testimony. The prosecutor's statements were neither comments on the evidence nor fair inferences based thereon, but rather, they were outright fabrications.

■ We believe that the prosecutor's misrepresentations relating to the blood and hair comparisons were egregious. Defendant was entitled to a trial that comports with prevailing notions of fundamental fairness. (See *California v. Trombetta* (1984), 467 U.S. 479, 485, 81 L. Ed. 2d 413, 419, 104 S. Ct. 2528, 2532.) Here, the American ideals of fairness in our system of justice were not just ignored, they were trampled upon. We also believe that the prosecutor's misrepresentations relating to the blood and hair comparisons precluded any possibility of a verdict based on a quest for the truth. As a result, we conclude that defendant was denied a fair trial, and a new trial is required.

■ We next address the issue relating to the State's destruction of the only vaginal swab that was taken from the victim. Defendant was indicted on January 9, 1981. On the same day that he was indicted, defendant filed a motion for pretrial discovery pursuant to Supreme Court Rule 412 (107 Ill. 2d R. 412). The motion requested a "list of all physical property that the State intends to use at trial" and it further requested that "such property be made available to the defense for inspection before trial." About a month after the defendant filed his motion, the State filed an answer which listed the existence of the vaginal swab that was taken from the victim. However, on the same day that the State filed its answer, without notice to the defendant or the court, Tahir took the vaginal swab to the Scotland Yard Metropolitan Police Forensic Laboratory, in London, England. At the Scotland Yard laboratory, Tahir either performed, or ordered, a destructive test of the vaginal swab.

Prior to taking the vaginal swab to England, Tahir performed nu-

merous tests on the vaginal swab at the Illinois Crime Laboratory. The tests in Illinois were conducted to determine the presence of semen and an ABO blood type from the mixed secretions on the vaginal swab. At the time the tests were performed in Illinois, Tahir knew from a specimen of the victim's blood that the victim had type O blood with Gamma Markers Plus 1, Plus 2 and Plus 10, and that the defendant was a nonsecretor with type AB blood and Gamma Markers Minus 1, Minus 2 and Plus 10.

Tahir took the vaginal swab to Scotland Yard to test it for the precise Gamma Markers that were found in the victim's blood, Plus 1, Plus 2 and Plus 10. The record clearly demonstrates that Tahir knew or should have known that whatever remained of the vaginal swab from the prior testing in Illinois would be consumed in the testing that was done at Scotland Yard.

The destructive test at Scotland Yard revealed that Gamma Markers Plus 1 and Plus 2 were present in the mixed secretions on the vaginal swab; the test for Gamma Marker 10 was inconclusive. Since Gamma Markers Plus 1 and Plus 2 mask any other combination of Gamma Markers 1 and 2, and the victim's blood contained Gamma Markers Plus 1 and Plus 2, the test that was done at Scotland Yard proved to be essentially meaningless. Moreover, it seems that the results of the test for Gamma Markers 1, 2 and 10 that was done at Scotland Yard were predictable. Thus, the test that was done at Scotland Yard appears to have been a useless test.

At trial, after the State put on its case in chief, defendant made a motion to dismiss the indictment because of the State's destruction of the vaginal swab. Defendant argued that his constitutional right to due process was violated by the State's destruction of material evidence without first informing defendant, or without obtaining leave of court. Defendant's motion was denied.

On appeal, the State argues that it had no obligation to preserve the vaginal swab because defendant's discovery motion did not "specifically request production of the vaginal swab." We disagree. The constitution of our country prohibits the government from suppressing material evidence in a criminal case. This tenet was first pronounced in *Brady v. Maryland* (1963), 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196-97. In *Brady*, the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196-97.) Contrary to the State's argument in the present

case, if the State destroys material evidence after a defendant is indicted, a due process violation occurs even if defense counsel failed to specifically request the particular evidence, or made no request at all. (*United States v. Agurs* (1976), 427 U.S. 97, 107, 49 L. Ed. 2d 342, 451-52, 96 S. Ct. 2392, 2399; *United States v. Alderdyce* (9th Cir. 1986), 787 F.2d 1365, 1369; *Hilliard v. Spalding* (9th Cir. 1983), 719 F.2d 1443, 1445.) Under *Agurs*, the pertinent test is the materiality of the evidence that is involved, rather than the specificity of the defendant's request for production of the evidence. Thus, in the present case, the State's argument that it had no duty to preserve the vaginal swab because defendant did not specifically request production of the vaginal swab is without merit.

■ We must next determine whether the vaginal swab was material within the context of *Agurs*. To meet the standard of constitutional materiality that is referred to in *Agurs*, "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*California v. Trombetta* (1984), 467 U.S. 479, 489, 81 L. Ed. 2d 413, 422, 104 S. Ct. 2528, 2534; *People v. Emrich* (1986), 113 Ill. 2d 343, 353, 498 N.E.2d 1140, 1145.) Here, even if defendant was able to show that the vaginal swab evidence conclusively established that the seminal material was not from defendant, that evidence would not tend to exculpate defendant from the murder charge because it would not exclude him from being someone who could have had sexual intercourse with the victim, and it would not exclude him from being someone who could have committed the murder. We therefore conclude that the vaginal swab evidence does not possess an exculpatory value with respect to the murder charge in the new trial. Thus, defendant's contention that his constitutional right to due process has been violated by the State's destruction of the vaginal swab is unavailing.

■ Since we are remanding this case for a new trial solely on the murder charge, we shall address the admissibility of the vaginal swab evidence as it may relate to the new trial. No evidence is admissible unless it is relevant. (See Fed. R. Evid. 402.) In order to be relevant, the offered evidence must have a tendency to make the existence or nonexistence of a fact of consequence more probable or less probable than it would be without the offered evidence. (See Fed. R. Evid. 401; McCormick, Evidence sec. 185, at 542 (3d ed. 1984).) At the new trial, the most that the vaginal swab evidence could conceivably show is that defendant has a blood type that makes him a member of a sub-

stantial percentage of the male population who could possibly have had a sexual encounter with the victim, without any reference as to when the sexual encounter occurred. This evidence, if it is accepted as true,[6] would not have a tendency to make the existence of a fact of consequence in the murder charge more probable than it would be without that evidence. The amorphous pool within which the defendant would be placed is much too large to have a tendency to prove any fact. Thus, the vaginal swab evidence would not be relevant as substantive evidence in the new trial of the murder charge.[7]

We therefore conclude that if the State should comment upon or attempt to introduce evidence relating to the vaginal swab as substantive evidence in the new trial, and defendant makes a timely objection based upon relevancy, the objection must be sustained.

■ In addition, if the vaginal swab evidence were considered relevant in the new trial of the murder charge, we conclude that it would not be admissible because it could not pass the balancing test. Although relevant, evidence will be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 188-89, 449 N.E.2d 821, 826-27; *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 489, 485 N.E.2d 1292, 1299; see also Fed. R. Evid. 403.) Here, all of the evidence that could be produced by the State relating to the vaginal swab is before us. Thus, the trial judge in the new trial would not be in a superior position to determine if its probative value is substantially outweighed by

---

[6]We note, however, that the testimony of the State's expert witness regarding the vaginal swab, was, at times, either plainly doubtful or confusing. Tahir testified on direct examination:

"Q. What, if anything, did you do with regard to that item?
A. Yes, I checked this swab for the presence of semen.
Q. And what results did you receive?
A. Vaginal swab positive for seminal material?
A. Yes.
Q. And could you detect an ABO blood type from the seminal material?
A. Yes, it was an ABO group, Blood group O."

If Tahir was able to detect an ABO blood type from the seminal material, then the depositor of the seminal material must have been a secretor. Moreover, if this testimony by Tahir is taken as true, then the seminal material could not have been from the defendant because he is a nonsecretor and has type AB blood, rather than type O blood.

[7]If the vaginal swab evidence were to be considered relevant, but not possessing an exculpatory value, then the vaginal swab evidence would be subject to exclusion in the new trial because of the State's advertent destruction of the vaginal swab, after the defendant filed his pretrial discovery motion, without giving notice to the defendant or the court. See Supreme Court Rule 415(g) (107 Ill. 2d R. 415(g).)

the danger of unfair prejudice. We therefore believe that it is appropriate for us to make this decision at this time. As the State concedes in its briefs, the vaginal swab evidence would have little or no probative value to the murder charge. Contrariwise, there is great danger of unfair prejudice to defendant if the State is permitted to introduce evidence suggesting rape in a trial where the only charge is murder. We conclude that to the extent that the vaginal swab evidence could possibly have any probative value, its probative value is substantially outweighed by the danger of unfair prejudice that would result from the admissibility of that evidence.

 █ There are two other issues raised by defendant. He contends that he was denied a fair trial because a newspaper article and information about the amount of his bail were brought into the jury room and discussed by the jury. He also contends that he was denied a fair trial because a juror was discharged during the trial without his consent. We have considered these alleged errors and conclude that they would not warrant reversal of the conviction in this case and that they should not recur at the new trial.

Accordingly, the conviction is reversed, and the case is remanded for a new trial, with directions.

Reversed and remanded, with directions.

WHITE, J., concurs.

## APPENDIX

The 24-year-old victim, Karen Anne Phillips, lived alone in a studio apartment in Oak Park. On Friday, October 3, 1980, she attended nursing school at Rush-Presbyterian St. Luke's Hospital in Chicago. A classmate drove her home after class adjourned. Phillips then went to Kriya Yoga Temple in Chicago, where she was studying to be a swami. Phillips returned to her apartment about 10:30 p.m., at which time a friend, Helen Palella, telephoned to arrange a shopping trip for Saturday.

On Saturday, about 1 a.m., Phillips' next door neighbor, Mohammed Azedejn, heard pounding noises coming from Phillips' apartment. Azedejn knocked on Phillips' door and the noise ceased, but no one responded. After Azedejn returned to his apartment, the pounding noise resumed and then stopped.

Early Saturday afternoon, when Phillips did not show up for her shopping trip with Palella, Palella's husband went to Phillips' apartment to see if she was all right. When he failed to receive any re-

sponse at the apartment, he contacted the Oak Park fire department. Shortly thereafter, firemen discovered Phillips' body in her apartment.

Oak Park police investigated the crime. Officer Patrick Kelly testified that when he entered Phillips' apartment, he saw a body lying flat, face down on the floor with the arms extended forward and the "legs were extended out from the rear of the body, slightly parted, distance of about two feet between the ankles." The body was naked, except for a nightgown pulled tightly around the neck, and exhibited numerous wounds and abrasions about the face, head and back. The decedent's fingers were pressed together to form a hand signal which in the Kriya Yoga religion signifies that the person was accepting death and seeking peace. At the direction of Officer Kelly, 11 photographs were taken of the victim. One of the photographs (State's Ex. 3—I) shows the victim's upper body; the victim is lying flat in a supine position with her face bloodied. Another photograph shows the victim's upper body and part of her legs. This photograph (State's Ex. 3—J) shows the victim lying flat, face downward with her arms extended forward, and her legs lying flat with only a few inches of space between them. Five of the photographs (State's Ex. 3—A, B, C, D, F) show the victim lying flat, face downward with her arms extended forward, and her legs lying flat, slightly parted, and extended out from the rear of the body, a distance of about two feet between the ankles. Three of the photographs (State's Ex. 3—E, G, H) show the victim's upper body; the victim is lying flat, face downward with her arms extended forward. Another photograph (State's Ex. 3—K) shows only the back of the victim's head. None of the photographs show the victim lying in a position that is characteristic of a sexual encounter.

In addition, in their investigation the police found hairs which did not belong to the decedent in the decedent's hand, pubic region, and on the carpet and bed sheet. Hair strands, blood samples, and vaginal, rectal and oral swabs were taken from the body. There was no evidence of a forcible entry into the apartment. A tire iron, encrusted with blood and hair, was found in some bushes outside the apartment. All of the evidence obtained by the investigating police officers was sent to the crime laboratory for analysis. Later, an autopsy revealed that the death was caused by a combination of beating and strangulation. No witness testified that Phillips had been raped or sexually abused.

Defendant, Steven Paul Linscott, 26 years old at the time of the occurrence, was a Bible student at Emmaus Bible College in Oak

Park. He lived with his wife and two children a few houses from the decedent's apartment. Previously, defendant attended the University of Maine for two years and then joined the United States Navy. There, he became a radioman, and after background investigations, he was granted a top secret clearance. After an honorable discharge in March 1979, the Linscotts lived in Maine. That fall, they moved to Chicago, where defendant entered Emmaus. The Linscotts spent the following summer in Maine, and then moved to Oak Park a month before the occurrence. There is no criminality in defendant's history, and he had never been arrested before this occurrence.

With respect to the present case, on Friday, October 3, 1980, defendant's wife went to bed at 10 p.m. She does not know when defendant went to bed. However, she arose during the night and again at 6 a.m. to attend to the children. On both occasions, defendant was sleeping in bed. On Saturday afternoon, area residents were questioned by the police regarding the murder. Defendant was told by the police that if he remembered anything unusual, "no matter how silly it might seem," he should report it to the police. According to defendant, at this point he remembered a vivid dream from the previous night. The dream, which had occurred at about 1 a.m., involved a brutal beating. Defendant did not mention the dream to the police at this time.

On Sunday, defendant told someone who worked in the building where he lived that he dreamed about a murder on Friday night. This person thought that defendant should contact the police about his dream. On Monday, defendant had a discussion with his wife about a newspaper account of Phillips' murder and about his dream. Defendant's wife thought that he should tell the police about his dream if he thought it might be helpful to the police.

After the discussion with his wife on Monday, defendant telephoned the Oak Park police and said that he had dreamed about a murder on the same night as the murder that had been reported. Defendant was told to write an account of his dream and that the police would contact him later. That evening, two police officers went to defendant's residence. They read defendant's account of the dream, and one of the police officers asked defendant why he had not described the murder weapon. According to the police officer, defendant had stated in the unrecorded telephone conversation that evening that defendant thought the murder weapon was a blunt object that looked like a tire iron. Defendant denied that he referred to the murder weapon as a tire iron, and he told the police officer that he had not described the weapon as a tire iron in his written account because he

was uncertain what the object was in his dream.

Defendant told the officers that in his dream a man bludgeoned a woman to death. The man in the dream was approximately 20 to 30 years old, had straight blond hair, was light complected, had a somewhat husky build, and was approximately 5 feet 5 inches to 5 feet 7 inches tall. He was wearing brown trousers and a terry-cloth shirt with two or three stripes across the chest. In the first stage of the dream, the attacker was quiet and easygoing, but defendant noticed a change come over the person. Defendant then awakened, tried to shake off the dream and fell back asleep. His dream continued with the man striking the woman on the head when she was lying or crouching on the floor. The victim had an air of acceptance even though she did not expect the attack, and she did not offer much resistance.

After hearing defendant recount his dream, one of the police officers noticed similarities between defendant's physical appearance and the physical characteristics of the attacker who appeared in defendant's dream. Defendant has straight blond hair, a light complexion, and a somewhat husky physique. He is just a bit under 6 feet tall. After concluding the interrogation, the police officers requested defendant's cooperation in the investigation, and defendant agreed.

Two days later, one of the police officers telephoned defendant and asked him to go to the police station. When defendant arrived at the police station, he was wearing a light colored terry-cloth shirt with a light colored stripe on a dark colored sleeve. He was taken to a conference room, where his conversation with two police officers was recorded.

In the conference room, defendant stated that on October 4, between 1 a.m. and 3 a.m., he had a vivid dream. The dream was about a ruthless beating. He said the attacker wore a white or off-white terry-cloth shirt with two red or purple stripes on the chest and one on the sleeve. He thought that the victim knew her assailant because they were at ease with one another. In response to a question, defendant said that he thought the victim was a religious person. When asked about her background, defendant said that she was somewhat intelligent, "at least high school and beyond a little bit." Defendant had the impression that the beating occurred close by in a living room which was the same size or larger than his four-room apartment. He said the living room contained a couch and a stereo. Defendant said that in his dream, the victim and the attacker talked for a while. Defendant did not know how long they talked or what was said. After a time, the attacker produced a dark, metallic instrument and began

striking the woman in the face. The instrument was tapered down at one end and rounded at the other. Defendant was unsure what the instrument was, but he described it as a "counterbalance like a clock."

Prior to the time that defendant told police about his dream, there was a newspaper report of the murder. The newspaper article described the victim as a 24-year-old female, living alone and working as a nurse's assistant. The newspaper article used the word "bludgeoned," as did defendant in relating his dream. Also, the article indicated that the victim was struck by a blunt instrument and that she suffered a head wound. In addition, the newspaper article stated that the police suspected that the victim knew her attacker because there were no signs of forced entry into the apartment.

On October 10, defendant returned to the police station for another interview. This time an assistant State's Attorney was present. Defendant recounted his dream, and he then agreed to give the police blood, saliva, and head and pubic hair samples. Later, defendant was charged with the crime.

PRESIDING JUSTICE McNAMARA, dissenting:

I respectfully dissent from the majority holding that prosecutorial remarks made during closing arguments constitute reversible errors. As I stated in my previous dissent, I do not believe that any of the claimed errors warrant reversal, and I would affirm defendant's conviction. *People v. Linscott* (1985), 135 Ill. App. 3d 773, 781, 482 N.E.2d 403 (McNamara, J., dissenting), *reversed* (1986), 114 Ill. 2d 340, 500 N.E.2d 420.

Initially, I summarize the points which I find require my dissent.

I believe the prosecutor's comments that the victim was raped by a nonsecretor were based on reasonable inferences which could be drawn from the evidence of blood comparison tests performed on the semen, and I find that the majority inaccurately depicts the prejudice of these comments by quoting them side by side when in fact they are separated by 63 pages in the trial transcript's 83 pages containing the parties' closing arguments.

I believe the prosecutor's arguments that the term "consistent" was the equivalent of the terms "not dissimilar," "identical," and "matching" were not impermissible statements regarding the hair comparison evidence, especially in light of the fact that the supreme court and both experts used some of the same terms. In addition, the majority deletes an important statement immediately preceding the relevant quotation.

I would also find that the prosecutor's argument regarding the

mathematical probabilities of the hair comparison was not reversible error, and that the majority distorts the entire issue by devoting a substantial part of its opinion to the three complained-of sentences uttered during the lengthy closing arguments and by offering as support an extensive analysis of three technical forensic journal articles which were not in evidence nor cited by the witnesses.

I also disagree with the holding that the vaginal swab should not be admitted during the new trial.

In closing arguments, a prosecutor may base argument on the evidence presented or reasonable inferences drawn from that evidence. (*People v. Morrison* (1985), 137 Ill. App. 3d 171, 484 N.E.2d 329.) A prosecutor is allowed a great deal of latitude during closing argument (*People v. Hine* (1980), 88 Ill. App. 3d 671, 410 N.E.2d 1017), and the trial court's determination of the propriety of closing argument will generally be followed on review absent a clear abuse of discretion (*People v. Smothers* (1973), 55 Ill. 2d 172, 302 N.E.2d 324).

The majority first quotes the prosecutor's argument that "Karen was raped by a non-secretor ***." The majority finds that the prosecutor erred both in stating that the victim was raped, and in stating that the semen belonged to a nonsecretor.

As to the first point, the majority asserts that there was "no such evidence or testimony from anyone" that the victim was raped. (159 Ill. App. 3d at 75.) To reach this conclusion, it relies only upon Tahir's testimony that it was impossible to determine the age of the semen found in the victim. Without explanation, the majority ignores the most obvious circumstantial evidence which might permit a finding that the victim was raped.

The condition of a victim's clothing and laboratory findings of semen are relevant evidence in a rape case and may constitute incriminating circumstances. (See *People v. Pearson* (1972), 52 Ill. 2d 260, 287 N.E.2d 715; *People v. Kirkwood* (1959), 17 Ill. 2d 23, 160 N.E.2d 766, *cert. denied* (1960), 363 U.S. 847, 4 L. Ed. 2d 1730, 80 S. Ct. 1623.) In the present case, photographs introduced into evidence depicted the victim's body lying face down on the floor with the victim's legs spread widely apart. She was naked except for a nightgown pulled up around her shoulders. In addition, a vaginal smear revealed the presence of seminal material. On the basis of the evidence, then, it is not improper for the prosecutor to ask the jury to infer that the victim was raped. The majority undermines its own reasoning by stating that it was "possible" that the victim was not raped. (159 Ill. App. 3d at 75.) The evidence shows, however, that it was a fair inference to state that the victim was raped.

As to the second point, the majority cites the prosecutor's arguments that "Karen was raped by a non-secretor and the defendant is a non-secretor. *** Seminal material. One fact it came from a non-secretor. Mr. Linscott is a non-secretor." (159 Ill. App. 3d at 76.) I believe the majority errs in finding that these two brief comments, made during a lengthy trial, constitute reversible error. Furthermore, prosecutorial comments must be read in context. (*People v. Diaz* (1984), 123 Ill. App. 3d 239, 462 N.E.2d 770.) The majority dramatizes and magnifies the effect of the prosecutor's language by placing the two quotations next to each other when they are actually separated by 63 pages in the 83 pages of the transcript which contain the parties' closing arguments. For several reasons, I do not agree that these isolated comments deprived defendant of a fair trial.

The majority erroneously states that the "made-up" evidence referred to in the quoted language actually indicates that the pool of possible assailants could be drawn "even from the entire population." (159 Ill. App. 3d at 76.) A careful reading of the record reveals that the contrary is true. Tahir testified that sections of the male population definitely could be excluded, *e.g.*, a secretor with a blood type of "AB."

In addition, I cannot say the prosecutor's comment that the semen "came from a non-secretor" is reversible error. (159 Ill. App. 3d at 76.) During closing arguments, both the prosecutor and defense counsel repeatedly referred to "consistency" evidence or argued to the jury that the tests failed to eliminate defendant. The evidence clearly supported these statements. The laboratory tests showed that the semen could be from either a nonsecretor or a secretor with the same blood type as the victim. The record, read as a whole, discloses no basis for a finding that the jury might believe the laboratory evidence definitively determined whether the semen was from a secretor or nonsecretor. A prosecutor may comment on the evidence, even if contradictory evidence was presented. (*People v. Gacy* (1984), 103 Ill. 2d 1, 468 N.E.2d 1171, *cert. denied* (1985), 470 U.S. 1037, 84 L. Ed. 2d 799, 105 S. Ct. 1410.) The prosecutorial comments at issue here go to the weight of the State's evidence and arguments, not to the propriety of the arguments. (See *People v. Gacy* (1984), 103 Ill. 2d 1, 468 N.E.2d 1171.) The jury, as the trier of fact, is the proper forum to resolve factual questions such as whether the evidence supported inferences on which the prosecutor commented in closing arguments. See *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.

Furthermore, I would find that even if the prosecutorial com-

ments regarding the blood comparisons were improper, the remarks did not substantively prejudice defendant. (See *People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200.) While the evidence offered some support for the rape charge, the jury found defendant not guilty of rape. The testimony about semen and blood comparisons might have offered some support regarding the issue of whether defendant was even present in the victim's apartment, but as our supreme court stated, the "State's primary evidence at trial was defendant's own statements." (*People v. Linscott* (1986), 114 Ill. 2d 340, 344, 500 N.E.2d 420.) No substantial prejudice occurred.

After a thorough review of the record, I conclude that in regard to the blood comparisons, the majority's strong language accusing the prosecutor of lying is unsupported by the record. The majority incorrectly finds the "prosecutor just simply made up that piece of 'evidence,'" *i.e.*, that the semen was from a nonsecretor. (159 Ill. App. 3d at 76.) It mistakenly characterizes the prosecutor's argument regarding the blood comparisons as a "false and a stark distortion of the possibility that the defendant was the assailant." (159 Ill. App. 3d at 76.) I believe the majority's comments are inappropriate, as the record reveals no evidence of fabrication. Instead, the record shows only an advocate's forceful argument in an adversarial setting.

The majority next challenges two of the prosecutor's comments regarding comparisons of hair samples found in the victim's apartment, and samples taken from defendant. In one remark, the prosecutor stated that there was "[p]ubic hair in the woman's crotch matching Mr. Linscott." I do not agree that the use of the word "matching" requires reversal. Siegesmund also used the terms "match" and "mismatch." Notably, the supreme court used the same word when it stated that the "matching of defendant's hairs to those found at the crime scene, while not conclusive in itself, nonetheless provides additional support to the jury's verdict." (*People v. Linscott* (1986), 114 Ill. 2d 340, 349, 500 N.E.2d 420.) I would find no error here.

The prosecutor also argued that laypersons equate the terms "nothing dissimilar" and "identical" with the scientist's terms "consistent." While this argument may lack sufficient clarity to substantially aid a jury, I find no reversible error. This is particularly true in light of the fact that the majority places two quotations side by side when they are actually separated by 39 pages. Furthermore, the majority takes the language regarding "identical" hair samples out of context by deleting the remark which prefaces the quotation.

"What does he [Tahir] mean by consistent. He means there is

nothing dissimilar."

This remark accurately restates Tahir's testimony. Moreover, I cannot find defendant was substantially prejudiced by the argument that "consistent" means "identical" when the term "consistent" was frequently used by Tahir and by both attorneys. Tahir testified that some of the hairs found near the victim were "consistent" with defendant's hairs. The prosecutor asked Tahir to define the term "consistent." Tahir stated that if he looks "at both samples at the same time and if [sic] identifying any differences between those two samples there is no dissimilarity, that means it is a [sic] consistent." If Tahir found "so much dissimilarity" between hairs, he would not regard them as consistent. On redirect examination, the prosecutor again emphasized that the hairs were only "consistent." The substantial testimony and argument on this issue highlighted, and left little room for dispute, that the laboratory tests could do nothing more than either exclude or not exclude defendant from a group. The tests could not positively identify the assailant as either defendant or any other person. For example, during cross-examination of Tahir the following colloquy took place:

"Q. And you sure can't determine from whose head that hair came from, can you?

A. You cannot positively say.

Q. You can't even say it is similar, can you?

A. I said consistent.

Q. You did not use the word similar did you?

A. No.

Q. Similar means alike, doesn't it?
***

A. Similar means to me is similar. That is all I can say.
***

Q. You have not used that word ["similar"]?

A. I have used [it] a few times.

Q. But you did not use it in this case, did you?

A. No.
***

Q. Well, what does consistent mean to you?

A. *** [I]f there are two hairs and you look in the microscope and you did not find any dissimilarities in those two samples, to me [they] are consistent.

Q. All right, let me rephrase it this way then—if you don't find any inconsistencies then it is consistent with, is that right?

A. Yes.

\* \* \*

 A. And you cannot positively say that this hair came from
this individual. \* \* \* [You] only could say \* \* \* it is consistent
with."

Significantly, Siegesmund explained that it is easier to establish "with
a reasonable degree of scientific certainty that hair could not have
come from someone. It's more difficult to establish whether hair in-
deed did come from someone."

Thus, I believe that Tahir's own use of the word "dissimilar" and
the extensive testimony regarding the terminology was such that the
jury would not be confused. I cannot agree, therefore, with the major-
ity's conclusion that the prosecutor's comments regarding these terms
were a "distortion of Tahir's testimony" and a "distortion of the
meaning of the evidence." (159 Ill. App. 3d at 79.) Furthermore, the
majority's characterizations of the prosecutor's choice of words as
"clever, but definitely misleading," and as "gamesmanship" are un-
supported by the record. 159 Ill. App. 3d at 79.

The majority next challenges another portion of the closing argu-
ments, primarily focusing on three sentences uttered by the prosecu-
tor concerning mathematical probabilities which were included in hair
comparison studies published by the forensic scientist, Gaudette. The
majority attacks both the form and substance of these three senten-
ces.

As to the form, the majority found it misleading for the prosecu-
tor to restate questions he had asked the defense expert, without fol-
lowing up with a recitation to the jury of the witness' answers. After
reviewing the record, I cannot say that such an obvious advocate's
technique was prejudicial, confusing to the jury, or tantamount to re-
versible error. The jury heard the defense expert's testimony, and this
sole reference to the mathematical probabilities in closing argument
does not demand a new trial. Moreover, defendant did not suffer sub-
stantial prejudice as a result of the argument. Even if the answers
had been recited verbatim, defense counsel made no attempt to elicit
any testimony during redirect examination of the prosecution's expert
which might have explained or expanded upon the sketchy references
to the probabilities made during cross-examination.

In regard to the merits of the mathematical probabilities men-
tioned in the three complained-of sentences, the majority finds that
"the figures from Gaudette's study have no application to the hair
comparisons that were made in [this] case, and \* \* \* that the figures
from Gaudette's study do not have general application to hair compar-
isons \* \* \*." (159 Ill. App. 3d at 80.) To support this conclusion, the

majority offers an exhaustive review of three articles written by Gaudette. I question this court's authority to review these articles.

Neither the witnesses nor the attorneys cited any article by Gaudette during the trial. The identification of the articles first appears in defendant's briefs before this court. During the trial, the only mention of a possible source was the prosecutor's reference to Gaudette's "study in the early to middle 70's *** with regard to percentages and probabilities of hair comparisons." The only apparent basis relied upon by the majority as authority for it to review the publications appears in a footnote asserting that the majority "assume[s] that the prosecutor was fully aware of what is stated in Gaudette's study" since "it was the prosecutor who first brought up" the study during cross-examination of Siegesmund. (159 Ill. App. 3d at 80 n.5.) I believe the majority exceeded its power when it reviewed the merit of the scientific information contained in these articles.

In addition to questioning our authority to review the articles, I find the majority's reasoning objectionable on other grounds. The majority undertakes an extensive analysis of the research, methods, tests, types and number of comparisons revealed in Gaudette's published articles. The parties, however, offered no testimony from any expert forensic witnesses to thoroughly explain to the jury the scientific principles relied upon by the majority, and consequently it was not possible to probe the expert opinions through cross-examination regarding these highly technical and possibly controversial studies. The majority devotes an inordinate amount of its analysis to this issue. I must conclude, therefore, that a primary basis of its decision to reverse and remand rests upon an untenable assertion.

Furthermore, the majority's extensive review of the Gaudette articles and research is particularly inappropriate in light of the extremely sketchy testimony offered by the witnesses on the mathematical probabilities. The portion of Siegesmund's limited testimony regarding Gaudette which was most emphasized by both parties at trial concerned his use of a comparison microscope and his approval of elemental analysis, and did not concern the mathematical probabilities. In order to demonstrate this fact, I set forth the full extent of the testimony regarding Gaudette, which is found in the 1,700-page trial transcript:

> "PROSECUTOR: You are aware of a forensic scientist by the name of Barry Gaudette, are you not?
>
> SIEGESMUND: Gaudette is one of the proponents of X-ray analysis.
>
> Q. Mr. Gaudette performed a study in the early to middle

70's, did he not, with regard to the percentages and probabilities of hair comparisons?

A. Absolutely.

Q. And his technique that he used was with a comparison microscope, was it not, sir?

A. He used comparison. And he, also, used other microscopes.

Q. But he used a comparison microscope. The one microscope you did not use, is that correct?

A. Yes, he did use that, also.

Q. And his probabilities came to the substance that a match between two head hairs is likely in one out of every 4,500 cases, is that correct?

A. Well, can I explain that?

Q. I'll rephrase the question. Did he not come up with a figure that any two individuals, the probability they would have matching head hairs is a likelihood in one out of 4,500?

A. It depends on how many hairs you are talking about.

Q. Would you say, the more hairs you have to compare, the closer to that figure you get?

A. The higher the probability, that is correct.

Q. So in this case if we have but one hair, that Mr. Tahir linked to Mr. Linscott, that would have that much meaning, is that correct?

A. Yes. Using the conventional techniques that Gaudette used, yes.

Q. That Gaudette used, that's correct?

A. Yes.

Q. If you have two to three hairs, your information is a little better, is that correct?

A. Yes. Only if you do those forty tests that he recommends.

Q. Fine. If you had, approximately, seven or eight hairs, you have more information to base it on?

A. According to Gaudette, that would give you a higher probability. If you did the forty tests.

Q. Did Mr. Gaudette, also, establish there is a difference between head hair and pubic hair?

A. Absolutely.

Q. The probabilities that any two people would have the same pubic hair are one in eight hundred?

A. Yes.

Q. Is that the figure Mr. Gaudette gave?

A. That is correct."

On redirect examination, defense counsel asked Siegesmund only about Gaudette's approval of elemental analysis, and made no effort to inquire about the statistical figures which had been briefly mentioned during cross-examination. On re–cross-examination, Siegesmund was questioned briefly only about Gaudette's use of a comparison microscope and approval of elemental analysis. The record clearly shows the scantiness of testimony regarding the mathematical probabilities, and thus highlights the majority's disproportionate attention given to that testimony.

Defense counsel commented in closing argument that he was "not going to weigh that expert testimony. You heard both of them. It's your function." I believe the majority should follow this well-established principle. Instead, it disturbs the jury verdict based upon technical scientific information which was not before the jury.

In reference to these mathematical probabilities, the majority again makes unsupported accusations. It states that the prosecutor "misled the jury by recalling only his questions" and ignoring the answers. The majority depicts the comments as "outright fabrications" and characterizes the argument as "a calculated, rank misrepresentation" and as "a distortion of the witness's testimony." (159 Ill. App. 3d at 81.) As I have demonstrated, there is no basis in the record for these charges.

Finally, because it is remanding for a new trial, the majority raises the issue of the relevancy of the vaginal swab evidence. Notwithstanding my opinion that the cause need not be remanded, I do not agree that the evidence should be excluded during the new trial. The evidence shows that the laboratory results fail to exclude defendant. The qualifying factors which limit the value of those tests were repeatedly stated to the jury. The jury should be allowed to determine the weight to be given to this evidence.

In addition, I believe the majority errs by holding at this stage that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. The supreme court referred to the evidence that defendant was placed in a category of nonsecretors along with nearly half of the population. The court noted the limited value of the evidence, but did not entirely discount it. (*People v. Linscott* (1986), 114 Ill. 2d 340, 500 N.E.2d 420.) I would find that, similar to the hair comparisons, the blood comparison was "not conclusive in itself, [but] nonetheless provides additional support to the jury's verdict." See *People v. Linscott* (1986), 114 Ill. 2d 340, 349, 500 N.E.2d

420 (referring to hair comparisons only).

The majority briefly refers to the State's "advertent destruction of the vaginal swab" as requiring exclusion of the evidence under Supreme Court Rule 415(g). (159 Ill. App. 3d at 84 n.7.) The trial court's discretion to exclude evidence in order to remedy a discovery violation is a harsh remedy and should be used only in the most egregious circumstances. (See *People v. Anderson* (1980), 80 Ill. App. 3d 1018, 400 N.E.2d 675.) I do not believe the State acted egregiously when it had the swab flown to England for further tests performed by an impartial independent forensic laboratory, and the test results were immediately sent to defense counsel. Such a sanction would be disproportionate to the discovery violation, and defendant made no showing of how he was prejudiced by the violation. (See *People v. Loggins* (1985), 134 Ill. App. 3d 684, 480 N.E.2d 1293.) I would allow the introduction of the evidence at the new trial.

I would affirm the judgment of conviction.